# EXHIBIT 1

# EXHIBIT 1

ANDREW P. GORDON, ESQ.
Nevada Bar No. 3421
AMANDA C. YEN, ESQ.
Nevada Bar No. 9726
JOSEPH P. SCHRAGE, ESQ.
Nevada Bar No. 11270
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Ste. 1000
Las Vegas, NV 89102
Telephone:    702.873.4100
Facsimile:    702.873.9966
Email:        ayen@mcdonaldcarano.com

DARIUSH KEYHANI (DK9673) (*pro hac vice*)
MEREDITH & KEYHANI, PLLC
330 Madison Avenue, 6th Floor
New York, New York 10017
Telephone:    21.2760.0098
Direct Dial:  646.536.5692
Facsimile:    212.202.3819
Email:        dkeyhani@meredithkeyhani.com

*Attorneys for Plaintiff LT Game*
*International Ltd.*

# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| LT GAME INTERNATIONAL LTD., <br><br> Plaintiff, <br><br> v. <br><br> SHUFFLE MASTER, INC., <br><br> Defendant. | CASE NO.  2:12-cv-01216-GMN-GWF <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs LT Game International Ltd. and LT Game (Canada) Limited, wholly- owned subsidiary of LT Game Ltd., (hereinafter individually and/or collectively "Plaintiffs") for their Second Amended Complaint against defendant Shuffle Master, Inc. ("Defendant") allege as follows:

. . .

. . .

McDONALD • CARANO • WILSON LLP
2300 WEST SAHARA AVENUE–NO. 10, SUITE 1000 • LAS VEGAS, NEVADA
PHONE (702)873-4100 • FAX (702) 873-9966

**PRELIMINARY STATEMENT**

1.      This is an action for unfair competition under federal law, the State of Nevada common law, Macau commercial code and tortious interference with prospective business and contractual relations.

**PARTIES**

2.      LT Game (Canada) Limited is a wholly-owned subsidiary of LT Game Ltd., a major developer and provider of technologically innovative gaming and casino products and services in Macau and throughout Asia.

3.      LT Game (Canada) Limited conducts and manages the sales and marketing activities of LT Game Ltd.'s products and services internationally and has a principal place of business located at 289 Pilot Road, Suite B, Las Vegas, Nevada 89119.

4.      LT Game International Ltd. is the exclusive agent and licensee of LT Game Ltd.'s business, technology, intellectual property, and products sold to customers based in North America and has a principal place of business located at 289 Pilot Road, Suite B, Las Vegas, Nevada 89119.

5.      Plaintiffs are in the business of marketing, offering for sale, and the sale of technologically innovative and proprietary gaming and casino products and services to customers in the gaming and casino industry.

6.      Defendant is a company located at 1106 Palms Airport Drive, Las Vegas, Nevada 89119.

7.      Defendant is a direct competitor of Plaintiffs in the business of marketing and the sale of gaming and casino products to customers in the gaming and casino industry throughout the world including in Las Vegas, Nevada.

**JURISDICTION AND VENUE**

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, §1338, and §1367 as the present case arises under the Lanham Act, 15 U.S.C. § 1051 et seq., and as is hereinafter more fully described.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE · NO. 10, SUITE 1000 · LAS VEGAS, NEVADA
PHONE (702)873-4100 · FAX (702) 873-9966

10.     Defendant is headquartered in this Judicial District and accordingly is subject to the Jurisdiction of this Court.

## BACKGROUND

11.     Over the past few years, Defendant has engaged in an international campaign of unfair competition through the use of threats and disparagement of Plaintiffs' business and commercial activities and directly and/or indirectly interfered with Plaintiffs' business, contracts, and prospective deals and contracts relating to its products and services, including but not limited to, the LT Game Live Multi-Table System, in the United States and internationally.

12.     During the period of July 2009 through May 2010, and again in April 2011, Defendant's Senior Vice Presidents, including Jim Jackson, and other representatives of Defendant, among other threats, threatened Plaintiffs with litigation if Plaintiffs did not transfer their intellectual property rights into a patent pool for Defendant to use at no cost.

13.     Defendant has intentionally and continuously violated Plaintiffs' intellectual property rights and has engaged in unfair competition.

14.     The criminal courts in Macau have already found that the Defendant has "deliberately engaged in the crime of exclusive patent rights violations" and has ordered Defendant to pay damages and fines for its violation of the Macau Penal Code. *See* attached **Exhibit 1**, official English translations of the Macau court orders.

15.     Most recently, Defendant engaged in egregious acts of unfair competition and tortious inference with prospective contractual and business relations of Plaintiffs at the 2012 Global Gaming Expo Asia (G2E Asia) held in Macau in May of 2012.

16.     G2E Asia is one of the premier global gaming events and the largest sourcing platform for global suppliers to showcase new products and services, to meet qualified and high value buyers, and establish new contacts.

17.     Thousands of gaming executives from around the world attended the 2012 G2E Asia event.

18.     Upon information and belief, the 2012 G2E Asia was co-organized by American Gaming Association ("AGA") and G2E Asia Reed Exhibitions.

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE · NO. 10, SUITE 1000 · LAS VEGAS, NEVADA
PHONE (702)873-4100 · FAX (702) 873-9966

19.     Upon information and belief, at the G2E Asia, between May 22 and May 24, 2012, Defendant's CEO and board member of the AGA, Gavin Isaacs, (identified in Plaintiffs' First Supplemental Disclosures) used undue influence and made false representations to Frank Fahrenkopf, CEO of the AGA, and  Tom Loughran, Industry Vice President of G2E Asia Reed Exhibitions, (identified in Plaintiffs' First Supplemental Disclosures), among others, regarding the Plaintiffs, their commercial activities, intellectual property, and/or their products and services.

20.     Upon information and belief, Defendant's misrepresentations were made to coerce and strong-arm Plaintiffs into relinquishing their intellectual property rights protecting their products in commerce and at the 2012 G2E Asia, including the LT Game Live Multi-Table System, and withdrawing the Macau court-ordered injunction for patent infringement entered against Defendant a week prior.  Mr. Loughran conveyed to the Plaintiffs that if they did not withdraw their court-ordered injunction against Defendant, Plaintiffs would never be able to attend a G2E Asia event again.

21.     Upon information and belief, among other actions, Defendant used its influence as a board member of the AGA, and other resources, financial and otherwise, to employ the AGA's resources and staff, and others, to place physical barriers and blockades around Plaintiffs' marketing and display booths for its products and services at the 2012 G2E Asia and threatened Plaintiffs that if they did not relinquish their rights and withdraw their court-ordered injunction against Defendant for its patent infringement, their electrical power would be shut down and they would be thrown out of the tradeshow.

22.     Among other misrepresentations, on or about May 24, 2012, Defendant also alleged to Plaintiffs' prospective customers, business affiliates, and members of the gaming community that Plaintiffs have bribed judges and engaged in other unlawful activities.

23.     Defendant's actions have resulted in substantial reputational and business damage to Plaintiffs and limited Plaintiffs' opportunity to display, market, sell, and promote their products and services to customers in both the international and United States-based gaming community.

4

24.     Based upon information and belief, Plaintiffs' prospective business deals and contracts with Genting Malaysia Berhad ("GMB") have been derailed as a result of Defendant's actions.

25.     GMB has been in the resort, gaming, and hotel industry, among other leisure business ventures, for more than 45 years.

26.     GMB has millions of members in its promotional loyalty card programs and owns and manages properties and resorts with gaming facilities around the world, including in the United States.

27.     High level representatives of GMB attended the 2012 G2E Asia and contacted the Plaintiffs to inquire about the controversy created by Defendant's actions.

28.     Prior to Defendant's unlawful actions at the 2012 G2E Asia, Plaintiffs had been working toward reaching a deal with GMB for Plaintiffs' products and services, including potentially hundreds of installations of Plaintiffs' LT Game Live Multi-Table System.

29.     Working toward a deal for global installations of Plaintiffs' products, Plaintiffs and GMB negotiated for months via meetings with principals, high level representatives, and decision makers of the parties in Macau and Malaysia.

30.     All communications and negotiations between GMB and Plaintiffs came to an abrupt end after Defendant's aforementioned unlawful actions at the 2012 G2E Asia.

31.     Based upon information and belief, Plaintiffs' prospective deals and contracts with the Las Vegas Sands Corporation and The Venetian in Las Vegas, Nevada, the Commerce Casino in Commerce, California, and companies in Australia and elsewhere have been negatively impacted in terms of bargaining power, opportunity, scope of commitments, terms, and value as a result of Defendant's actions.

32.     Defendant is engaging in this course of action willfully and with full knowledge and intent to interfere and damage Plaintiffs' business deals with its current and prospect customers.

33.     Plaintiffs have no adequate remedy at law.

5

## COUNT I
## UNFAIR COMPETITION (LANHAM ACT)

34.    Plaintiffs repeat each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

35.    Defendant's aforesaid activities constitute unfair competition under the federal Lanham Act.

36.    Defendant's aforesaid activities have damaged and caused, and are damaging and causing, irreparable harm to Plaintiff.

## COUNT II
## UNFAIR COMPETITION (NEVADA COMMON LAW)

37.    Plaintiffs repeat each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

38.    Defendant's aforesaid activities constitute unfair competition under State of Nevada's common law.

39.    Defendant's aforesaid activities have damaged and have caused, and are damaging and causing, irreparable harm to Plaintiff.

## COUNT III
## UNFAIR COMPETITION (MACAU LAW - COMMERCIAL CODE)

40.    Plaintiffs repeat each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

41.    Defendant's aforesaid activities constitute unfair competition under Macau Commercial Code Articles 156-173, Title X, Book I.  Attached hereto as **Exhibit 2** is a true and correct English version of the Macau Commercial Code, Articles 101-200, Title X, Book 1.

42.    Defendant's aforesaid activities have damaged and have caused, and are damaging and causing, irreparable harm to Plaintiff.

. . .

. . .

. . .

6

## COUNT IV
## TORTIOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE BUSINESS AND CONTRACTUAL RELATIONS

43.     Plaintiffs repeat each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

44.     Plaintiffs have been in communications and negotiations with current and prospective customers for sale of its gaming and casino products.

45.     Defendant has been aware of these communications and negotiations.

46.     Defendant, directly and through its agents, has made false claims and misrepresentations regarding Plaintiffs and their products in order to undermine, interfere, and obstruct Plaintiff from making business relations, deals, and contracts for the sale of their products with their current and prospective customers.

47.     Defendant's aforesaid actions have undermined and damaged Plaintiffs' business relations with its current and prospective customers and have resulted in the loss of business deals and contracts.

48.     Defendant's aforesaid activities have damaged and caused, and are damaging and causing, irreparable harm to the Plaintiff.

### REQUESTED RELIEF

WHEREFORE, Plaintiffs pray that:

A.     Defendant, its agents, servants, employees, franchisees, licensees, attorneys, and all others in active concert or participation with Defendant, be enjoined and restrained, permanently from:

1.     Making misrepresentations regarding Plaintiffs, their business and commercial activities, and/or their products or services to any current or prospective customers of the Plaintiffs, the gaming and casino industry, and/or to the public;

2.     Unfairly competing with Plaintiffs in any manner;

B.     Plaintiffs recover Defendant's profits, as well as the damages sustained by Plaintiffs as a result of Defendant's unlawful actions, such amount of profits and damages to be trebled;

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE · NO. 10 · SUITE 1000 · LAS VEGAS, NEVADA
PHONE (702) 873-4100 · FAX (702) 873-9966

C.      Defendant be required to pay Plaintiffs' costs of this action, together with reasonable attorneys' fees and disbursements;

D.      Plaintiffs be awarded statutory damages pursuant to the Lanham Act; and

E.      Plaintiffs be awarded any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues properly triable by jury in this action.

RESPECTFULLY SUBMITTED this 31ST day of January, 2013.

McDONALD CARANO WILSON LLP

By: */s/ Dariush Keyhani*
ANDREW P. GORDON, ESQ. (#3421)
AMANDA C. YEN, ESQ. (#9726)
JOSEPH P. SCHRAGE, ESQ. (#11270)
2300 W. Sahara Avenue, Ste. 1000
Las Vegas, NV 89102
Telephone:      702.873.4100
Facsimile:      702.873.9966
Email:      ayen@mcdonaldcarano.com

DARIUSH KEYHANI (DK9673) (*pro hac vice*)
MEREDITH & KEYHANI, PLLC
330 Madison Avenue, 6th Floor
New York, New York 10017
Telephone:      21.2760.0098
Direct Dial:      646.536.5692
Facsimile:      212.202.3819
Email:      dkeyhani@meredithkeyhani.com

*Attorneys for Plaintiff LT Game International Ltd.*

LVDOCS-#271149-v1

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE • NO. 10, SUITE 1000 • LAS VEGAS, NEVADA
PHONE (702)873-4100 • FAX (702) 873-9966

8

# EXHIBIT 1

# EXHIBIT 1

(Emblem of Macau)

### JUDICIARY COUNCIL OF MACAU
### CRIMININAL PRELIMINARY HEARING COURT

[Translation]

Criminal Preliminary Hearing Court: 2nd jurisdiction

Case type:  Common Case – Preliminary

Case number:  PCI-073-09-2

Defendant: SHLF.-

Date remitted: 12/13/2012

To:
Dr. PAULA LING
Avenida da Amizade, n.º 555, Edif. Macau
Landmark Office Tower, sala 2301-2302
MACAU

### NOTIFICATION VIA REGISTERED MAIL

Subject:  Court Order of Pronouncement

---

For the effect and purpose of informing of the decision made by His Honor on December 13, 2012, pages 1069 to 1071 of the file, we hereby give notice to you of the following:

➢   The court order per the attached copy.

Kindest regards,

Head Court Clerk

_____

(signature illegible)

(Emblem of Macau)
JUDICIARY COUNCIL OF MACAU
CRIMININAL PRELIMINARY HEARING COURT

(STAMP COPY)

(illegible signature)

[Translation]

CONCLUSION:

- As of December 11, 2012 (December 8th, Saturday, eligible on December 10th)
The Head Court Clerk
(signature illegible)

## COURT ORDER OF PRONOUNCEMENT
***

In order to comply with the decision of the Court of the Second Trial Court passed during the penal proceedings under 585/2010, this Criminal Preliminary Hearing Court advises of the decision against the Company referred to below. The judgement shall be lodged with the Judiciary Council of Macau and shall follow common procedure with the intervention of the single court.

SHFL (text in Cantonese) (in Portuguese, SHFL Entretenimento (Ásia) Limitada), initially indicated in the file as Shuffle Master Asia (text in Cantonese), under business registry number 19870(SO) and headquartered at Avenida Wai Long, Edificio da CAM, 1.º andar B, Taipa (see the certificate of business registry on pages 1062 to 1068 of the file).

The defendant is accused of:

### 1.

The defendant, SHFL (text in Cantonese) (initially indicated in the file as Shuffle Master Asia (text in Cantonese)), exhibited a set of products from its own company called "Rapid Baccarat" with the intent and purpose of attracting clients in Macau on at least one occasion on June 03, 2009 in exhibitor booth number 903 at the G2E Asia Exposition which took place in Area A of the Convention and Exposition Center at The Venetian Macau – Resort – Hotel. (See the content of pages 3 to 6v and 44 to 46 of the file.)

### 2.

The exhibited products in reference consist of a system of playing baccarat in the traditional manner of playing baccarat. The dealer deals cards and winnings. The difference between online baccarat and traditional baccarat lies in the manner in which bets are taken in the online version. Instead of using a traditional method of placing bets with chips, a touch screen is used to place bets. The player's screen shows the amount of the bet placed, the results of the bets, and the cards dealt. Once all the players have placed their bets, the dealer deals cards from a dealing machine located on the gaming table. Through the use of a scanner and a camera

(Emblem of Macau)
JUDICIARY COUNCIL OF MACAU
CRIMININAL PRELIMINARY HEARING COURT


[TRANSLATION]

above the game table, the dealer instantly shows which cards had been dealt on the players' touch screens.  The dealer's computer also shows the game results in the event.  After verification of the results by the dealer, the computer automatically distributes the winnings which are shown instantaneously on the winner's screen.  The computer automatically retains the results of all games (wins and losses) (see page 53v of the file).

In the English language version pamphlet of the alleged products, the following may be seen:

(Text in English)
... (see pages 64 to 66 of the file)

4.

One the other hand, in regards to the aforesaid products, **Jay Chun** (plaintiff) submitted complaint(s) to the Macau Department of Economic Services about patent violations of his invention entitled "method and system of playing jackpot baccarat" which had been successfully registered for many years in Macau and continues to reap benefits.  The title of the previously mentioned patent may be found under registry number I/000150.

5.

The name of the invention referred to in the abovementioned patent was designated by the plaintiff, LT Game Limited (Cantonese text) as "Live Baccarat" and consists of a method and system of playing jackpot baccarat live (see pages 592 to 597v of the file).  One of the characteristics of playing jackpot baccarat consists of using combinations of different face value of cards.  Another characteristic of the jackpot game consists of a previous deposit of an initial amount by the "house" (Cantonese text) which runs the baccarat game.  This invention also provides a computer program or a series of programs which permit the execution of all or part of the different stages of the game as have been published in the aforesaid invention (see pages 8 to 14 of the file).  The content of points 12 to 18 as claimed by the aforementioned registered invention patent consist of the following:
"...
12. A system to play baccarat live that permits the player (Cantonese text) to place jackpot bets.
This system is comprised of:
(1) A control unit (CU) which includes a device to shuffle cards and control buttons;
(2) A central processing unit to compute bets and retain in history (BCPU); and
(3) At least one gaming terminal (BT) for the players (Cantonese text)

CU requirements:
    Receive information from the control buttons generated by the *dealer* in the live baccarat game;
    Receive information from the device to shuffle the cards;

(Emblem of Macau)
## JUDICIARY COUNCIL OF MACAU
## CRIMININAL PRELIMINARY HEARING COURT

Send visual information to the monitor (screen); and
[Translation]

Send the results of the cards to the BCPU;

BCPU requirements:
Receive bets coming from the BT;
Receive the results of the cards sent by the CU;
Transmit the results of the bets to the BT; and

BT requirements:
Transmit information about bets to the BCPU;
Receive the bet results sent by the BCPU; and
Receive messages from the BCPU about credits.

13. In the system described in point 12, the device for card dealing is a device for automatic card dealing.

14. The gaming terminal system (BT), as described in point 12, encompasses a series of 2 to 250 gaming terminals (BTs).

15. The system as described in point 12, consists of approximately 50 gaming terminals.

16. The system as described in point 12 (CU, BCPU, BT) is interconnected via a local area network (LAN).

17. The gaming terminals are located in different gaming machines in the system as described in point 16.

18. The system as described in point 12 also includes a computer program or a series of programs which permit the execution of any CU, BCPU, and/or BT functions as outlined in point 12 above.

6.

On the other hand, pursuant to the comparative results of technical characteristics, as presented on July 21, 2009 by Lao Dong (Cantonese text), material expert in the field of patents from mainland China, who was contracted by the defendant to be present in Macau, the Public Ministry, in order to clarify questions regarding the patent at case (see pages 87 to 91 of the file), four similarities were found to exist in the technical characteristics between "Rapid Baccarat" and "Live Baccarat":
1. Both have a central processing unit to compute bets and retain a historical record of the bets (designated as BCPU in the "Live Baccarat" system);
2. Both provide the player (Cantonese text) with at least one terminal for bets (designated as BT in the "Live Baccarat" system);

(Emblem of Macau)
### JUDICIARY COUNCIL OF MACAU
### CRIMININAL PRELIMINARY HEARING COURT

3. The central processing units of both execute identical functions;
[Translation]

4. The terminals used for bets of both systems execute identical functions.


### 7.

The defendant, upon exhibiting his "Rapid Baccarat" product in Macau at the abovementioned exposition with the intent and purpose of attracting clients in Macau knows that he cannot exclude the existence of similar products which incorporate previously registered inventions in Macau. The defendant voluntarily resolved to proceed with the previously mentioned exhibit to attract clients, or be it, was fully aware that his acts could eventually violate certain technical characteristics protected under the plaintiff's patent (see pages 61 to 62 of the file).


### 8.

**In virtue of the above, SHFL (Cantonese text) deliberately engaged in the crime of "exclusive patent rights violation", as set forth by subparagraphs b) and c) of article 289 of the Law-Decree number 97/99/M (Legal Regime of Industrial Property).**

\*

**Evidence:**

Documentary:  All documents compiled in the file.

Witness:
1) (Cantonese text) (identified on page 247 of the file)

\*

**Measures of Constraint:**

Upon hearing the proposal of the Public Ministry and considering the principles of legality, adequacy and proportionality, pursuant to articles 181 and 182 of the Penal Process Code of Macau, it is hereby decreed that SHFL (Cantonese text) shall forfeit a fine equivalent to MOP 50,000 within the next 10 days.

\*

Please proceed to all notifications and execution of necessary diligence.
Please remit the file to the Judiciary Council of Macau for judgement.

(Emblem of Macau)
JUDICIARY COUNCIL OF MACAU
CRIMININAL PRELIMINARY HEARING COURT

*

[Translation]


December 13, 2012
Judge of the Criminal Preliminary Hearing Court

(signature illegible)
(Cantonese text)

Chiang I Man

**EXHIBIT 2**

**EXHIBIT 2**



Home > Legislation > Commercial Code > Art. 101 - 200

# COMMERCIAL CODE

[ ^ ] [ Commercial Code - Table of Contents ] [ Commercial Code - Table of Article ]
[ Decree-Law no. 40/99/M ] [ Commercial Code - Art. 1 - 100 ] [ Commercial Code - Art. 101 - 200 ]
[ Commercial Code - Art. 201 - 300 ] [ Commercial Code - Art. 301 - 400 ]
[ Commercial Code - Art. 401 - 500 ] [ Commercial Code - Art. 501 - 600 ]
[ Commercial Code - Art. 601 - 700 ] [ Commercial Code - Art. 701 - 800 ]
[ Commercial Code - Art. 801 - 900 ] [ Commercial Code - Art. 901 - 1000 ]
[ Commercial Code - Art.1001 - 1100 ] [ Commercial Code - Art. 1101 - 1200 ]
[ Commercial Code - Art. 1201 - 1268 ]

---

[ < ] [ ^ ] [ > ]

### Article 101

### (Acquisitive prescription [*usucapião*])

The time limits for acquisitive prescription of an enterprise are those provided for in the Civil Code regarding acquisitive prescription of immovables.

### CHAPTER II

### TRANSACTIONS OVER COMMERCIAL ENTERPRISE

### SECTION I

### GENERAL PROVISIONS

### Article 102

### (Existence of commercial enterprise)

For the purpose of negotiation, a commercial enterprise is considered to exist if factors of production are coordinated which are likely to signify for the public a new commercial enterprise of that type, regardless of the start of operations.

### Article 103

### (Form and registration)

1. The contracts that have as object the transfer of the ownership or enjoyment of a commercial enterprise, as well as the creation of property rights of enjoyment or guarantee over it, are valid if concluded in writing, with certification of the signatures of the contracting parties, except if another form is required by the nature of the goods that compose the enterprise.

2. A copy of the contracts mentioned in the previous paragraph shall be filed with a notary's office.

3. Contracts transferring the enjoyment of a commercial enterprise or creating property rights of enjoyment or guarantee over it are subject to registration, which is merely optional in the remaining cases.

[As amended by **Law no. 6/2000**, of April 27]

## SECTION II

## TRANSFER OF COMMERCIAL ENTERPRISE

## Article 104

## (Subsidiary rules)

The transfer of a commercial enterprise, in all matters not especially provided for in this Section, shall be regulated, with the necessary adaptations, by the provisions of the Civil Code that regulate the purchase and sale contract, or the donation contract, depending upon whether the transfer is against payment or gratuitous.

## Article 105

## (Scope of enterprise under transfer)

1. The transfer of a commercial enterprise includes that of all goods, tangible or intangible, that compose it and are used for the purposes of the enterprise, except those the transfer of which is legally subject to an express declaration.

2. Parties can exclude from the transfer such goods at they see fit, provided that the existence of the enterprise is not prejudiced by the exclusion, and without prejudice to the following paragraph.

3. The previous paragraph does not prevent the parties from excluding from the transfer any good essential to the existence of the enterprise, but in such case the acquirer shall have the right to keep its availability during the period of time necessary for the consolidation of the enterprise in his title.

4. The contract of transfer of the enterprise is sufficient title for the purpose of registration, in favor of the acquirer, of the goods subject to registration that are included in the transfer in accordance with the previous paragraphs.

## Article 106

## (Delivery of enterprise)

1. A transferor is obliged to practice all acts that, in accordance with usage and the type of enterprise transferred, are necessary, in accordance with good faith, for launching the transferee in its running.

2. The transferor namely is obliged to:

a) deliver the nominative lists of clients;

b) deliver the lists of suppliers and financiers;

c) deliver the lists of collaborators;

d) make available the bookkeeping and other correspondence related to the enterprise, for consultation and copy, for a period of five years;

e) deliver those trade and manufacture secrets which are not patented;

f) introduce the transferee to the clients, suppliers and financiers of the enterprise.

## Article 107

### (Usufruct and lease of enterprise)

Articles 105 and 106 apply, with the necessary adaptations, to the cases of usufruct and lease of an enterprise, during the period for which they last.

## Article 108

### (Obligation of non-competition)

1. Whoever transfers a commercial enterprise is obliged, for a maximum period of five years from the date of the transfer, not to exploit, either by himself or through or for the account of a third party, another commercial enterprise which, given its object, location or any other circumstances, has the potential to deviate clients from the transferred enterprise.

2. The same obligation applies to those who, as a result of their personal relations with the transferor, might redirect the clients of the transferred enterprise.

3. A dominant shareholder is subject to the obligation mentioned in paragraph 1 if he transfers his company participation.

4. The running of a commercial enterprise, either by himself or through or for the account of a third party, is not considered as included in the provision of paragraph 1 if the transferor already exercised it by the date of the transfer.

5. An agreement of non-competition setting limits more extensive than those imposed in paragraph 1 is valid, provided that it does not exceed the maximum time limit there stated, and that it does not make it impossible for the transferor to exercise any professional activity, whether entrepreneurial or not.

6. The obligation imposed in paragraph 1 can be set aside by will of the parties, provided that it does not render the transfer of the commercial enterprise non-viable.

7. The obligation of non-competition shall automatically cease with the closure and liquidation of the enterprise.

## Article 109

### (Breach of obligation of non-competition)

1. If the transferor breaches his obligation of non-competition, the creditor, besides the right to compensation that may exist, has a right to demand the immediate termination of the situation harmful to his rights, as well as, if the breach arises from the creation of a new commercial enterprise by the person subject to such obligation, to demand its immediate closure, except if the closure is harmful for the economy of the Territory.

2. The right to demand the immediate closure mentioned in the previous paragraph lapses if the injured party does not take legal action within three months from the date when he knew of or could have known of the situation.

## Article 110

### (Succession in contracts)

1. Except if there is an agreement to the contrary, and without prejudice to special provisions, an

acquirer succeeds in the rights and obligations resulting from contracts concluded for the running of the enterprise that do not have a personal nature.

2. The counterpart to such contracts can rescind the contract within three months from gaining knowledge of the transfer, if there is just cause, and without prejudice to the liability of the transferor.

3. The previous paragraphs apply to the usufructuary and to the tenant, for the duration of the usufruct or lease of the enterprise.

## Article 111

### (Succession in employment contracts)

1. An acquirer succeeds in the rights and obligations resulting from the employment contracts concluded by the transferor with the employees of the enterprise, except if, before the transfer, there was an agreement between the transferor and the acquirer, so that the employees would continue to work for the transferor in another enterprise.

2. The acquirer is jointly and severally liable with the transferor for all labor credits matured by the date of the transfer, even if these relate to employees whose labor contracts had already terminated, provided that, in the latter case, they have been claimed by the interested parties up to the moment of the transfer.

3. In case of transfer, an employee can release the transferor from the obligations resulting from the employment relation.

4. The previous paragraphs apply in case of usufruct or lease of an enterprise.

## Article 112

### (Credits relating to transferred enterprise)

1. Except if there is an agreement to the contrary, the transfer of an enterprise entails the automatic assignment of the credits related to the enterprise.

2. The assignment of the credits mentioned in the previous paragraph produces effect towards third parties from the date of registration of the transfer, even in the absence of notification or acceptance by the debtor.

3. A payment in good faith to the transferor, by the debtor assigned, releases the debtor.

4. The previous paragraphs only apply in case of usufruct or lease of the enterprise if expressly stipulated.

## Article 113

### (Debts relating to transferred enterprise)

1. An acquirer of an enterprise is liable for the debts resulting from its running before the transfer, provided that they are entered in the compulsory bookkeeping records.

2. The transferor is not liberated from debts resulting from running the enterprise prior to the transfer, except if the creditors expressly assent to this.

3. An acquirer who is held responsible, in accordance with paragraph 1, for any debts arising prior to the transfer, shall have a right of return against the transferor, except if there is an agreement to the contrary.

4. Paragraphs 1 and 3 apply in case of usufruct of the enterprise; in case of lease of the enterprise, only if expressly stipulated.

## SECTION III

## LEASE OF COMMERCIAL ENTERPRISE

### Article 114

### (Concept)

The lease of a commercial enterprise is the contract by which one of the parties undertakes to grant to the other, temporarily and against payment, the total or partial enjoyment of a commercial enterprise.

### Article 115

### (Time limit)

The time limit of a lease is five years, if not otherwise stipulated by the parties.

### Article 116

### (Subsidiary rules)

Without prejudice to special provisions, the general provisions of the Civil Code on the lease contract shall apply, with the necessary adaptations, to all matters not especially regulated in this Section.

### Article 117

### (Obligation to run commercial enterprise)

1. A tenant is obliged to exercise the commercial enterprise, observing the rules of a systematic and ordered manager, in order to preserve the efficiency of the organization and without modifying its destination.

2. The tenant cannot interrupt or cease the running of the enterprise, except in case of *force majeure*.

### Article 118

### (Powers of tenant)

A tenant enjoys the technical and economic discretion inherent to the exercise of the type of commercial enterprise at issue.

### Article 119

### (Acts of disposal and charges over the goods of an enterprise)

1. A tenant can only create charges, transfer and replace the goods that compose the commercial enterprise if such acts are necessary or convenient to the conservation of the efficiency of the organization, and always with the assent of the landlord.

2. Lack of communication of the refusal of assent, within eight days from the moment at which the tenant communicated to the landlord the intention to practice any of the acts mentioned in the previous paragraph, is equivalent to assent.

3. The assent of the landlord can be judicially substituted if the refusal is unjustified.

## Article 120

### (Prohibition of competition)

1. During the period of a lease, the tenant of a commercial enterprise cannot, either by himself or through or for the account of a third party, run an enterprise identical to the leased one, except with the assent of the landlord.

2. It is understood that the assent mentioned in the previous paragraph exists if, by the date of the lease of the enterprise, the tenant, with knowledge of the landlord, was already running an identical commercial enterprise.

3. Breach of paragraph 1 renders the tenant liable for the damage caused, without prejudice to the landlord's right to rescission of the contract.

## Article 121

### (Obligation to return)

Upon the expiry of the contract, the tenant is obliged to return the commercial enterprise, functioning, to the landlord.

## Article 122

### (Obligation of delivery by landlord)

A landlord is obliged, not only to deliver the leased commercial enterprise, but also to guarantee the effectiveness of such delivery for the duration of the contract, namely:

a) not to disturb the enjoyment of the enterprise by the tenant;

b) to effect the extraordinary repairs that may be necessary for the enjoyment of the enterprise;

c) to fulfill the formalities necessary to maintain the availability of the intangible goods that are part of the enterprise.

## Article 123

### (Obligation of non-competition)

1. A landlord is subject to the obligation of non-competition, imposed by article 108, for the duration of the lease of the enterprise.

2. The previous paragraph can be set aside by an express clause, without prejudice to paragraph 6 of article 108.

## Article 124

### (Breach of obligation of non-competition)

Article 109 shall apply, with the necessary adaptations, to the breach of the obligation of non-competition by the landlord of a commercial enterprise.

## Article 125

**(Immediate maturity of credits)**

1. If the enterprise is leased, the creditors of the landlord can claim the immediate payment of the credits relating to the running of the enterprise, if they demonstrate that the lease of the enterprise is likely to create a risk to their payment.

2. Judicial proceedings demanding the immediate maturity of the credits must be initiated within three months from the publication mentioned in paragraph 2 of article 103.

## Article 126

**(Joint and several liability of landlord)**

1. A landlord is jointly and severally liable with the tenant for the debts contracted in the running of the enterprise up to 30 days after the fulfillment of paragraph 2 of article 103.

2. If the landlord is made liable towards third parties for the debts mentioned in the previous paragraph, the landlord shall have a right of return against the tenant.

## Article 127

**(Liability of judicial administrator)**

The previous article does not apply to a contract of lease of an enterprise concluded by a judicial administrator, provided that paragraph 2 of article 103 has been complied with.

## Article 128

**(Transfer of leased enterprise)**

Except if there is agreement to the contrary, the tenant cannot, without authorization of the landlord, sublet the enterprise or transfer his contractual position or, in any other form, allow the total or partial enjoyment of the enterprise by a third party.

## Article 129

**(Succession in lease contract of enterprise)**

1. The acquirer of the right on the basis of which the contract of lease of an enterprise was concluded succeeds in the rights and obligations of the landlord, without prejudice to the rules on registration.

2. The previous paragraph applies to the acquirer of an enterprise in a judicial sale.

## Article 130

**(Termination of lease of enterprise)**

The termination of the lease of an enterprise causes the immediate maturity of the debts contracted by the tenant in its running.

[As amended by **Law no. 6/2000**, of April 27]

## Article 131

**(Publicity of termination of lease of an enterprise)**

The termination of the lease of an enterprise is subject to registration and shall be announced by

adequate means, namely through newspaper publication.

[As amended by **Law no. 6/2000**, of April 27]

## CHAPTER III

## USUFRUCT OF ENTERPRISE

### Article 132

### (Creation of usufruct over an enterprise)

The owner of a commercial enterprise can create a usufruct over the enterprise in favor of a third party.

### Article 133

### (Subsidiary provisions)

Without prejudice to special provisions, the provisions of the Civil Code on usufruct shall apply, with the necessary adaptations, to all matters not especially regulated in this Chapter.

### Article 134

### (Obligations of usufructuary)

1. The usufructuary is obliged to exercise the enterprise under the firm of the holder of the underlying ownership right [*proprietário de raiz*].

2. Paragraph 1 of article 117 is applicable to the usufructuary, with the necessary adaptations.

3. If the usufructuary breaches the previous paragraph or arbitrarily ceases operation of the enterprise, paragraph 2 of article 138 shall apply, with the necessary adaptations.

### Article 135

### (Powers of usufructuary)

A usufructuary enjoys the technical and economic discretion inherent to the exercise of the type of commercial enterprise at issue.

### Article 136

### (Acts of disposal and charges over goods of the enterprise)

1. A usufructuary can create charges, transfer and replace the goods of the commercial enterprise if such acts are necessary or convenient to the conservation of the efficiency of the organization.

2. The holder of the underlying ownership right has always the possibility to judicially contest the practice of the acts mentioned in the previous paragraph.

3. If the acts mentioned in paragraph 1 are practiced in breach of the criteria stated therein, the owner of the underlying ownership right can request the application of paragraph 2 of article 138.

### Article 137

### (Prohibition of competition)

1. While a usufruct lasts, the usufructuary cannot, without assent of the holder of the underlying ownership right, by himself, through or for the account of a third party, run an enterprise identical to the one that is object of the usufruct.

2. It is understood that the assent mentioned in the previous paragraph exists if, at the date of the creation of the usufruct, the usufructuary, with knowledge of the holder of the underlying ownership right, was already running an identical commercial enterprise.

3. Breach of paragraph 1 renders the usufructuary liable for damage caused, without prejudice to the right of the holder of the underlying ownership right to demand the extinction of the usufruct.

## Article 138

### (Bail)

1. A usufructuary is obliged to post bail.

2. If a usufructuary does not post such bail, the holder of the underlying ownership right has the right to demand that the commercial enterprise be leased or that its running be entrusted to an administrator, the rent or the profits being for the usufructuary.

## Article 139

### (Obligation of non-competition)

1. A holder of the underlying ownership right is subject to the obligation of non-competition in accordance with article 108.

2. The previous paragraph can be set aside by express clause, without prejudice to paragraph 6 of article 108.

## Article 140

### (Breach of obligation of non-competition)

Article 109 shall apply to breach of the obligation of non-competition, with the necessary adaptations.

## Article 141

### (Liquidation of inventory balance)

Any negative difference between the initial inventory and the inventory upon termination of the usufruct shall be liquidated, as money, on the basis of the market value at the time of the termination of the usufruct.

## Article 142

### (Compensation of usufructuary for the increase of value of enterprise)

A usufructuary has a right to compensation, calculated according to equity, if, by his action, the value of the enterprise has substantially increased.

## Article 143

### (Publicity of termination of usufruct)

The termination of a usufruct of an enterprise is subject to registration and shall be announced by

adequate means, namely through newspaper publication.

[As amended by **Law no. 6/2000**, of April 27]

**CHAPTER IV**

**PLEDGE OF ENTERPRISE**

**Article 144**

**(Pledge of enterprise)**

1. A commercial enterprise, or one of its branches, can be object of a pledge.

2. The pledge of an enterprise produces effect irrespective of delivery to the creditor.

3. A commercial enterprise can be object of more than one pledge.

**Article 145**

**(Effect of pledge of an enterprise)**

The creation of a pledge over a commercial enterprise only produces effect, even between the parties, after registration in the competent office.

**Article 146**

**(Minimum content)**

A document creating a pledge over an enterprise shall mention, under penalty of nullity, the following elements:

a) identity of the entrepreneur and the creditor;

b) identity of the enterprise or branch over which it is made;

c) amount of the debt or elements that allow its determination;

d) place and date of payment.

**Article 147**

**(Scope of pledge of an enterprise)**

1. Without prejudice to the following paragraphs, a pledge of a commercial enterprise includes all goods, tangible or intangible, that compose it at the moment of its creation, whether they are mentioned or not in the accounting records of the entrepreneur; in the latter case, it is up to the creditor to prove that a certain good belongs to the enterprise for the purpose of inclusion in the guarantee.

2. For the pledge of a commercial enterprise to produce effect over goods subject to registration, which are put to the use of such enterprise, it has to be entered in the register of each one of such goods.

3. The pledge also covers the goods that are later included in the enterprise, from the moment of such inclusion; the goods that, in accordance with the rules of a systematic and ordered management, are transferred by the debtor and withdrawn from the enterprise before the creditor

takes judicial action to exercise his right of pledge, are released from the pledge.

4. The withdrawal of any goods that are part of the enterprise, in conditions other than those mentioned in the previous paragraph, cannot be invoked against good faith third party buyers, but it causes the pledger to incur the liability applicable to fiduciary depositaries.

## Article 148

### (Duty to manage enterprise)

1. Once a pledge over an enterprise is created, the entrepreneur shall exercise it in a manner so that the value of the guarantee does not suffer reduction.

2. If a reduction of the value of the guarantee such as to put at risk the right of the pledge creditor arises from the running of the enterprise, the pledge creditor can demand, in accordance with civil law, the reinforcement of the guarantee or, if this is not possible, the passing of the management of the enterprise to a third party administrator, in accordance with paragraph 2 of article 138.

3. If the management of the enterprise is passed to a third party, the profits arising from running it shall be used in payment of the debts secured by the pledge of such enterprise.

4. If the management of the pledged enterprise is passed to a third party, in accordance with paragraph 2, the debtor, if he does not have other sources of income, can demand the allocation of an amount for the satisfaction of his needs.

## Article 149

### (Removal of pledged enterprise)

A debtor must inform the pledge creditors of the enterprise, with 15 days advance, of his intention to move the enterprise to another place within the Territory, under penalty of immediate maturity of the respective credits.

## Article 150

### (Extinction of lease)

1. Having received communication of the creation of the pledge of an enterprise, a landlord who intends to terminate the lease of the building where the pledged enterprise is located shall inform the registered pledge creditors; both debtor and creditor can effect the communication mentioned in this paragraph.

2. In case of breach of the previous paragraph, the landlord is obliged to compensate the said creditors for the damage caused.

## Article 151

### (Effects of pledge of enterprise)

1. The pledge of an enterprise grants to the creditor the right to the payment of his credit, as well as the interest, if any, for the value of the enterprise with preference over other creditors who do not enjoy a special privilege.

2. The concurrence of pledges over an enterprise is decided on the basis of priority in registration.

3. The pledge of an enterprise does not prejudice the real guarantees that charge the goods which compose such enterprise, existing at the date of its creation; however, real guarantees created over the goods of the enterprise after the creation of the pledge over the enterprise do not produce

effects in relation to the pledge creditor, and subject the debtor to the liability applicable to fiduciary depositaries.

## Article 152

### (Judicial sale of pledged enterprise)

1. A pledge creditor, if his credit is not paid, has the right to demand the judicial sale of the enterprise.

2. The judicial sale shall be organized in a manner so that the enterprise is not destroyed.

3. If the sale of the enterprise as a whole is not possible, a sale of autonomous units shall be arranged, and only if this cannot be done will it be possible to liquidate the enterprise; in the latter case, the pledge creditor shall hold a mortgage or pledge right over each of the goods that compose the enterprise at that moment, depending upon the nature of the respective good.

## TITLE X

## REGULATION OF COMPETITION BETWEEN ENTREPRENEURS

## CHAPTER I

## COMPETITION BETWEEN ENTREPRENEURS IN GENERAL

## Article 153

### (Legal limits)

1. Competition between entrepreneurs shall take place in a manner that does not harm the interests of the economy of the Territory, and within the limits established by the law.

2. All agreements or practices that have the object or effect of preventing, falsifying or restricting competition are forbidden, without prejudice to special provisions.

## Article 154

### (Contractual limits)

1. An agreement restricting competition between entrepreneurs shall, under penalty of nullity, respect the limits indicated in the previous article and be made in writing.

2. For the agreement to be valid, it must be limited to a certain zone or to a certain activity.

3. If the duration of the agreement was not set, or was set for a longer period, it shall be valid for five years only.

## Article 155

### (Obligation to contract)

Whoever exercises an enterprise in conditions of legal monopoly is obliged to contract with whoever requires the performances which constitute the object of the enterprise, observing the principle of equality of treatment.

## CHAPTER II

## UNFAIR COMPETITION

## Article 156

### (Objective scope)

1. The conducts mentioned in this Chapter are considered unfair if they are practiced in the market with the purpose of competition.

2. It is presumed that the act is practiced with the purpose of competition if, by the circumstances in which it takes place, it is objectively adequate to promote or to ensure the distribution in the market of the products or services of the party or of a third party.

## Article 157

### (Subjective scope)

1. The norms on unfair competition apply to entrepreneurs and to whoever participates in the market.

2. The application of the rules on unfair competition is independent of the fact that the subjects act in the same branch of activity.

## Article 158

### (General clause)

Unfair competition is any act of competition that objectively reveals itself to be in breach of the norms and honest usage of economic activity.

## Article 159

### (Acts of confusion)

1. An act is considered as unfair if it is adequate to create confusion with the enterprise, the products, the services or the credit of competitors.

2. The risk of association by consumers regarding the origin of a product or service is sufficient basis to consider a practice unfair.

## Article 160

### (Misleading acts)

The use or broadcast of incorrect or false indications, as well as the omission of real ones, as well as any act which, by the circumstances in which it takes place, has the potential to induce in error the persons it reaches, or to whom it is addressed, regarding the nature, aptitudes, qualities and quantities of the products or services and, in general, the advantages really offered, is considered unfair.

## Article 161

### (Offers)

1. The delivery of offers with advertising purposes, and analogous commercial practices, are considered unfair if, by the circumstances in which they take place, the consumer is put in a situation of having to contract the main performance.

2. The offer of any type of advantage or premium for the case of acquiring the main performance is considered unfair if it induces or can induce the consumer in error concerning the level of prices of other products or services of the same entrepreneur, or if it renders excessively difficult the assessment of the effective value of the offer or its comparison with alternative offers.

## Article 162

## (Negative statements)

1. The making or broadcast of statements on the enterprise, products, services or commercial relations of competitors, which are apt to diminish their credit in the market, is considered unfair except if they are exact, true and pertinent.

2. Statements on the nationality, the religious or ideological beliefs, the private life or any other exclusively personal circumstances of any person are not considered pertinent.

## Article 163

## (Acts of comparison)

1. The public comparison of one or another person's enterprise, products or services with those of a competitor is considered unfair if it relates to realities that are not analogous, relevant or ascertainable.

2. The comparison shall also be considered unfair if it is made in the terms indicated in articles 160 and 162.

## Article 164

## (Acts of imitation)

1. Imitation of the products, services or entrepreneurial initiatives of other persons is free, unless they are protected by an exclusive right recognized by the law.

2. Imitation of the products or services of a third party is considered unfair if it is adequate to create an association on the part of consumers in relation to the product or service, or if it makes it possible to unduly take advantage of the reputation or efforts of other persons.

3. The inevitability of the risk of association or of exploitation of the reputation of other persons excludes the unfairness of the respective practice.

4. Without prejudice to the previous paragraph, the systematic imitation of the products, services and entrepreneurial initiatives of a competitor is considered unlawful if the said strategy is directly aimed at hindering or obstructing his affirmation in the market and exceeds what, according to the circumstances, may be considered a natural response from the market.

## Article 165

## (Exploitation of other persons' reputation)

Improper exploitation of the entrepreneurial reputation of another person, to one's own benefit, or to a third party's, is considered unfair.

## Article 166

## (Breach of secrets)

1. The spreading or exploitation, without permission from the holder, of industrial secrets or any other entrepreneurial secrets that were either accessed legitimately, but with a duty of confidentiality, or not legitimately, namely as a consequence of any of the conducts mentioned in the following article, is considered unfair.

2. For the purpose of this article, all and any technical or commercial information that has a practical

use and provides economic benefits to the holder, which is not public knowledge, and in relation to which the holder took appropriate security measures to guarantee its respective confidentiality, is considered an entrepreneurial secret.

## Article 167

### (Promotion and exploitation of contractual breaches)

1. The instigation of employees, suppliers, clients and other obliged parties to the breach of contractual obligations that they have undertaken towards competitors, is considered unfair.

2. The promotion of the regular termination of a contract or the exploitation of another person's contractual breach, if known, to own or to a third party's benefit, are considered unfair if they have as object the diffusion or exploitation of an enterprise secret, or take place with circumstances such as deceit, the intention to eliminate a competitor from the market, or analogous ones.

## Article 168

### (Exploitation of dependence)

The undue exploitation by an entrepreneur of a situation of dependence, with economic repercussions, in which entrepreneurs who are his clients or suppliers may find themselves, and who do not have an equivalent alternative for the exercise of their activity, is considered unfair.

## Article 169

### (Sales at a loss)

Sales effected below the cost or acquisition price are considered unfair, if they are part of a strategy directed at the elimination of a competitor or group of competitors from the market.

## Article 170

### (Judicial action for unfair competition)

Judicial action for unfair competition shall be initiated within one year from the date when the injured party had or could have had knowledge of the person who practiced the facts that provide its basis, but not more than three years after their occurrence.

## Article 171

### (Sanctions)

A judicial decision declaring the existence of acts of unfair competition shall determine the prohibition of the continuation of the said practice, and shall indicate the appropriate means to eliminate the respective effects.

## Article 172

### (Compensation for damage)

1. If acts of unfair competition are practiced intentionally or with fault, the tortfeasor is obliged to compensate the damage caused.

2. In the case mentioned in the previous paragraph, publication of the judicial decision can be ordered.

3. If the existence of acts of unfair competition is proven, fault is presumed.

## Article 173

### (Legitimacy of entities representing of interested parties)

If acts of unfair competition harm the interests of a category of interested parties, the judicial action for unfair competition can also be initiated by entities representing the said category.

## BOOK II

## EXERCISE OF A COLLECTIVE ENTERPRISE AND CO-OPERATION IN THE EXERCISE OF AN ENTERPRISE

## TITLE I

## COMMERCIAL COMPANIES

## CHAPTER I

## GENERAL PART

## SECTION I

## GENERAL PROVISIONS

## Article 174

### (Types of commercial companies)

1. General partnerships [*sociedades em nome colectivo*], limited partnerships [*sociedades em comandita*], private companies [*sociedades por quotas*] and public companies [*sociedades anónimas*] are deemed to be commercial companies, irrespective of their object.

2. Companies having as object the exercise of a commercial enterprise can only be created in accordance with one of the types mentioned in the previous paragraph.

## Article 175

### (Territorial scope)

1. Companies having their main administration in the Territory are subject to the provisions of this Code.

2. Companies having their registered office in the Territory cannot invoke against third parties the fact that they do not have their main administration here in order to avoid the application of the provisions of this Code.

## Article 176

### (Personality)

Commercial companies gain legal personality with the registration of their act of incorporation.

## Article 177

### (Capacity)

1. The capacity of commercial companies comprises the rights and obligations necessary, useful or convenient to the achievement of their aims, with the exceptions mentioned in the law and those arising from the nature of collective persons.

2. Gratuitous acts that may be considered usual, in accordance with the circumstances of the season and the conditions of the commercial company itself, are not regarded as being contrary to the aim of the company.

3. Companies cannot provide personal or real guarantees for obligations of other persons, except if there is an own interest of the company, declared and reasoned in writing by the organ of administration.

## Article 178

### (Companies with permanent activity in the Territory)

1. Companies which exercise permanent activity in the Territory, even without having their registered office or main administration in the Territory, are subject to the legal provisions on registration.

2. The companies mentioned in the previous paragraph must appoint a representative with permanent residence in Macao, set aside capital for its activity in the Territory, and register the respective resolutions.

3. The representative in Macao shall always have the power to receive any communications, citations and notifications that may be addressed to the company.

4. A company that does not comply with paragraphs 1 and 2 is nevertheless bound by the acts practiced in its name in Macao, and the persons who have acted, as well as the administrators of the company, are also liable for such acts.

5. The court, upon request of the Public Ministry or of any interested party, shall order the termination of the activity and the liquidation of the assets in Macao of companies that do not comply with paragraphs 1 and 2; the court can grant them a time limit of no more than 30 days to regularize their situation.

## SECTION II

## ACT OF INCORPORATION

## SUBSECTION I

## FORM AND CONTENT OF ACT OF INCORPORATION

## Article 179

### (Form and minimum content of the act of incorporation)

1. The creation of a company shall be done by means of a written document, with certification of the signatures of the shareholders, unless another form is required by the nature of the goods with which the shareholders contribute to the company.

2. A copy of the act of incorporation shall be filed with a notary.

3. The act of incorporation must mention:

a) the date of its conclusion;

b) the identity of the shareholders and that of their representatives in such act;

c) the declaration of the shareholders' intention to create a company of one of the types mentioned by the law;

d) the capital subscribed by each shareholder;

e) the articles of association that shall regulate the functioning of the company;

f) the appointment of the administrators and, if they exist, the single supervisor or the members of the supervisory board, and the company secretary;

g) if made by means of a private document, a declaration issued by a lawyer, stating that, having followed all the process of incorporation, he verified the absence of any irregularities in it.

4. The articles of association must mention:

a) the type and the firm of the company;

b) the object of the company;

c) the registered office of the company;

d) the company capital, with indication of the method and the time limit of its payment;

e) the composition of the administration and, in cases in which it should exist, that of the supervision of the company.

5. The act of incorporation shall be signed by a number of shareholders equal at least to the minimum legally required for each type of company.

6. The act of incorporation shall be drafted in one of the official languages.

[As amended by **Law no. 6/2000**, of April 27]

## Article 180

### (Object)

1. The object of a company shall be indicated in a manner that conveys the activities that the company intends to carry out and which constitute it.

2. In mentioning the object of the company, it is forbidden to use expressions that may induce third parties to believe that the company operates activities that it cannot conduct, namely because such activities can only be exercised by companies regulated under special rules or is dependent upon administrative authorization.

## Article 181

### (Registered office)

1. The registered office of a company shall be established in a determined place.

2. The administration of the company can freely move the registered office within the Territory.

3. The registered office does not prevent the stipulation of a special domicile for certain transactions.

## Article 182

### (Expression of capital)

The amount of the company capital shall always be expressed in *patacas*.

## Article 183

### (Duration)

1. If no duration was stated in the articles of association, the duration of a company is for an undetermined period of time.

2. After the expiry of the duration stated in the articles of association, its extension can only be agreed by unanimity, except if there is a legal provision to the contrary.

## Article 184

### (Special rights)

1. Special rights of any shareholder can only be created by means of a stipulation in the articles of association.

2. Except if there is an express provision to the contrary in the articles of association, special rights cannot be suppressed or modified without the agreement of the respective holder.

## Article 185

### (Agreements outside the company)

1. Agreements outside a company, concluded between all or some shareholders, by which, in such capacity, they undertake to perform a conduct not forbidden by the law, are effective between the intervening parties; however, the validity of the acts of the company or of acts of the shareholders towards the company cannot be contested on the basis of such agreements.

2. The agreements mentioned in the previous paragraph can touch upon the exercise of voting rights, but not upon the conduct of persons intervening, or of other persons, in the exercise of functions of administration or supervision.

3. Agreements according to which a shareholder undertakes to:

a) always vote in accordance with the instructions of the company or of one of its organs;

b) always vote for the approval of the proposals made by these;

c) exercise or abstain from exercising the right to vote in return for special advantages,

shall be void.

## SUBSECTION II

## REGISTRATION OF ACT OF INCORPORATION

## Article 186

### (Certification of payment of company capital)

[Revoked by **Law no. 6/2000**, of April 27]

## Article 187

**(Time limit and legitimacy to apply for registration)**

1. The registration of a company shall be applied for within 15 days from the date of the act of incorporation.

2. The members of the organ of administration and the company secretary, if there is one, have the duty to apply for registration.

3. Any shareholder has legitimacy to apply for registration.

4. The Public Ministry shall promote the liquidation of any non-registered companies that have been in activity for more than three months.

## Article 188

### (Effect of acts prior to registration)

1. With registration, a company undertakes the obligation to refund the registration expenses, taxes and fees inherent to the process of incorporation, to the person who has paid these.

2. By an act of the administration, which shall be communicated to the counterpart within 30 days from the date of registration, the company can decide to take up all other expenses arising from the process of incorporation prior to registration, including payment of fees for services rendered.

3. As a result of registration, a company assumes the rights and obligations arising from acts earlier practiced in its name, provided that the time limit mentioned in paragraph 1 of the previous article is not exceeded and that such acts were practiced by the persons empowered to bind the company subsequent to its registration.

4. The assumption by the company of the rights and obligations mentioned in the previous paragraphs releases from all responsibility the persons who would be personally liable for the acts from which such rights and obligations arise.

## Article 189

### (Relations between the shareholders prior to registration)

1. Relations between the shareholders prior to registration are regulated by the provisions of the articles of association and by the rules applicable to the type of company at issue, with the necessary adaptations, and with the exception of those that presuppose registration.

2. Before registration, the *inter vivos* transfer of company parts and the amendment of the articles of association always require unanimous agreement of the shareholders.

## Article 190

### (Relations with third parties prior to registration)

1. Without prejudice to article 188, if the activity of the company is started before its registration, those who act in representation of the company, as well as the shareholders who authorized them to act, shall be personally liable for the acts practiced.

2. The liability mentioned in the previous paragraph is joint and several and unlimited; it does not depend upon the previous exhaustion of assets pertaining to the activity of the company.

## SUBSECTION III

### INVALIDITY, RESPONSIBILITY, SUSPENSION AND SUPERVISION

## Article 191

### (Invalidity of act of incorporation)

1. The general rules on legal transactions [*negócio jurídico*] apply to the act of incorporation of a company, with the modifications mentioned in the following paragraphs.

2. If a company is already registered or has already started its activity, it enters liquidation as an effect of a declaration of nullity or an annulment of the act of incorporation; acts agreed with good faith third parties are not affected.

3. After the registration of a company, the declaration of nullity or the annulment of only a part of the act of incorporation, or only in relation to some of the parties, does not cause the start of its liquidation, except if the act of incorporation could not have been concluded without the part declared void or voided.

4. Nullity resulting from breach of provisions on the minimum content of the articles of association must be corrected by a resolution of the shareholders, within 30 days from knowledge of the defect.

5. The nullity mentioned in the previous paragraph can be corrected by the court, upon request of any interested party, if the shareholders do not execute it.

## Article 192

### (Liability for incorporation of company)

1. The administrators and the company secretary, as well as the lawyer who issue the statement according to which, having examined the whole process of incorporation, they verify the absence of any irregularity in it, are jointly and severally liable towards the company for its falsehood, inaccuracy or deficiency, without prejudice to any criminal liability that may arise.

2. Between liable persons, rights of return exist to the extent of their respective fault and the resulting consequences; the fault of the responsible persons is presumed to be equal.

3. However, persons mentioned in paragraph 1 who did not know of the falsehood, inaccuracy or deficiency of the declaration and, acting with the diligence of a systematic and organized manager, did not have to know it, are not liable.

## Article 193

### (Suspension of activity)

1. After the registration of a company, the shareholders can decide, by unanimity, to suspend its activity for an exactly determined period.

2. The shareholders and all others who might act in the name of the company are personally, jointly and severally, and without limit, liable for the acts practiced after the registration of the suspension and while it lasts, irrespective of the previous exhaustion of assets pertaining to the activity of the company.

3. The suspension of activity shall have a maximum duration of three years, renewable only once for an equal period; the resolution on restarting of the activity, or on the renewal of the suspension, shall be passed by the shareholders before the expiry of the period then underway, under penalty of dissolution of the company.

4. The suspension does not affect the need to fill the organs of the company, nor the need to submit a balance sheet for the approval of the shareholders at the end of each accounting period, neither the possibility for the shareholders to decide at any time to restart the activity.

## SECTION III

## RELATIONS BETWEEN SHAREHOLDERS AND THE COMPANY

## SUBSECTION I

## RIGHTS AND OBLIGATIONS OF SHAREHOLDERS IN GENERAL

### Article 194

### (Right to equality of treatment)

The relevant situations being identical, all shareholders shall be treated equally by the company.

### Article 195

### (Rights of shareholders)

1. In accordance with the terms, and with the limitations, mentioned in the law, and without prejudice to other rights specially recognized, every shareholder has the right to:

a) receive a share of the profits;

b) elect the organs of administration and supervision, receive accounts from them and initiate liability proceedings;

c) obtain information on the activity of the company;

d) participate in company resolutions.

2. Any stipulation according to which a shareholder shall receive a fixed remuneration from his capital or industry is forbidden.

3. Any stipulation granting to any shareholder a special right to obtain information on the activity of the company is also forbidden.

### Article 196

### (Obligations of shareholders)

1. Every shareholder is obliged:

a) to contribute to the company with capital or, in the types of companies in which it is expressly allowed, with industry;

b) to share in losses, with the exception of the provisions on industry shareholders.

2. The capital must consist of any goods susceptible to judicial seizure [penhora] and the industry shall consist in any services.

## SUBSECTION II

## RIGHT TO PROFITS

### Article 197

### (Participation in profits and losses)

1. Except if there is a provision of the law or of the articles of association to the contrary, the shareholders share the profits and the losses of the company in accordance with the proportion of the nominal value of their respective capital participations.

2. Any provision depriving a shareholder from sharing in the profits of the company, or exempting him from responsibility in its losses, shall be void, except for the provisions on industry shareholders; the nullity of the clause determines the application of paragraph 1.

## Article 198

### (Profit and limits to its distribution)

1. Except if there is a legal provision allowing it, it is not possible to distribute any goods of the company to the shareholders, except as profits.

2. A profit of the company is the value arising from the accounts of the accounting period, calculated in accordance with the legal rules on the preparation and approval of such accounts, which exceeds the sum of the capital of the company plus the amounts already set aside or to be set aside as reserves in that accounting period and that the law or the articles of association do not allow to distribute to the shareholders.

3. If there are losses from the previous year, the profit of the accounting period cannot be distributed without first covering these, and then forming or replenishing the reserves that are compulsory in accordance with the law or with the articles of association.

## Article 199

### (Resolution on distribution of profits)

1. No distribution of profits can be made without a prior resolution of the shareholders to that effect.

2. The resolution shall discriminate, among the amounts to be distributed, between the profits of the accounting period and the free reserves.

3. The organ of administration has the duty of not executing any resolution of distribution of profits whenever such resolution or its execution, given the timing of the latter, is in breach of the previous article.

4. In case of non-execution of the resolution in accordance with the previous paragraph, the organ of administration shall communicate to the supervisory board or to the single supervisor, if they exist, the reasons that justify it, and shall call a general meeting to discuss and decide on the situation.

## Article 200

### (Return of goods unduly received)

1. The shareholders shall return to the company whatever they have received from it as profits in breach of the law, except if they did not know the irregularity and, taking into account the circumstances, did not have an obligation to know of it.

2. The creditors of the company can initiate proceedings for the reimbursement to the company of the amounts mentioned in the previous paragraph, provided that the non-reimbursement significantly affects the guarantee of their credits.

[ < ] [ ^ ] [ > ]

---

[ ^ ] [ Commercial Code - Table of Contents ] [ Commercial Code - Table of Article ]
[ Decree-Law no. 40/99/M ] [ Commercial Code - Art. 1 - 100 ] [ Commercial Code - Art. 101 - 200 ]
[ Commercial Code - Art. 201 - 300 ] [ Commercial Code - Art. 301 - 400 ]
[ Commercial Code - Art. 401 - 500 ] [ Commercial Code - Art. 501 - 600 ]
[ Commercial Code - Art. 601 - 700 ] [ Commercial Code - Art. 701 - 800 ]
[ Commercial Code - Art. 801 - 900 ] [ Commercial Code - Art. 901 - 1000 ]
[ Commercial Code - Art.1001 - 1100 ] [ Commercial Code - Art. 1101 - 1200 ]
[ Commercial Code - Art. 1201 - 1268 ]

Home          RSS                    CD-Rom LegisRAEM                    Gallery              Links
        Macao PostCards                      Contact Us                      Mailing List          Search

**Government Printing Bureau (Macao SAR)**
Rua da Imprensa Nacional, s/n - Macau
Phone: (853) 2857 3822 - Fax: (853) 2859 6802
Email: **info@imprensa.macau.gov.mo**

*© 2012 - Government Printing Bureau (Macao SAR) -*