DARIUSH KEYHANI (DK9673) (*pro hac vice*)
MEREDITH & KEYHANI, PLLC
330 Madison Avenue, 6th Floor
New York, New York 10017
Telephone:      212.760.0098
Direct Dial:     646.536.5692
Facsimile:      212.202.3819
Email: dkeyhani@meredithkeyhani.com

JACQUELYN S. LELEU, ESQ.
Nevada Bar No. 7675
AMANDA C. YEN, ESQ.
Nevada Bar No. 9726
JOSEPH P. SCHRAGE, ESQ.
Nevada Bar No. 11270
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Ste. 1200
Las Vegas, NV 89102
Telephone:      702.873.4100
Facsimile:      702.873.9966
Email: jleleu@mcdonaldcarano.com
          ayen@mcdonaldcarano.com
          jschrage@mcdonaldcarano.com

Attorneys for Plaintiff LT Game
International Ltd.

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| LT GAME INTERNATIONAL LTD., | CASE NO. 2:12-cv-01216-JAD-GWF |
| Plaintiff, | |
| v. | **LT GAME INTERNATIONAL LTD.'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| SHUFFLE MASTER, INC., | |
| Defendant. | |

Over the past four years, defendant SHFL entertainment, Inc. f/k/a Shuffle Master, Inc. ("SHFL") has used every trick in the book to try to prevent the LT Game Group from bringing its market-dominating Live Table Multi-Game electronic gaming product ("LTMG") to the U.S. Not surprisingly, these tricks continue to this day, as Defendant's motion is riddled with inaccurate versions of fact and misleading conceptions of the law.

First, Defendant's version of the facts is simply wrong. Defendant misstates and misapplies the facts and tells a tale that is inconsistent with the evidence - this is a case about a

company that cannot compete on the merits of its products and instead chooses to cheat. *See* Proposed Second Amended Complaint, attached hereto as **Exhibit 1**. These actions permeate SHFL's entire organization. Even its own President and CEO admits to making misrepresentations about the Plaintiff in his testimony under oath and in writing.

Second, SHFL is wrong on the law. The law of unfair competition is flexible and broad and encompasses unfair business practices and cheating in any form – even those not yet imagined. The depth and scope of this body of law is supported by a rich history of precedent and legal scholarship. Contrary to Defendant's narrow and self-serving conception of unfair competition, it is not confined to misrepresentations. Defendant's attempt to recast the law into something that would permit it to repeatedly threaten, strong arm, embarrass, and disparage its competitors with impunity is without support.

SHFL's international campaign of unfair competition has caused and continues to cause LT Game International, Ltd. ("LT Game International") irreparable harm that warrants a remedy. The time has come for SHFL to play fair.

# I.      STATEMENT OF FACTS AND BACKGROUND

## A.      SHFL has been unable to compete with LT Game in the world's largest gaming industry

At $38 billion in revenue per year, the Macau gaming market is almost five times the size of the Las Vegas strip and larger than the total U.S. casino industry combined. *See* Howard Stutz, *Macau Gaming Revenues Growing in 2012, Hit Record $38 Billion*, Las Vegas Review Journal, http://www.reviewjournal.com/business/casinos-gaming/macau-gaming-revenues-grow-2012-hit-record-38-billion, attached hereto as **Exhibit 2**.[1] Though large, the market is a tight knit community, consisting of a small number of buyers that operate gaming properties all around the world. *See* Expert Report of Alan P. Meister ("Meister Report") at 4-6, attached to the Declaration of Alan P. Meister ("Meister Decl.") filed concurrently herewith. As a tight

---

[1]      "This court may take judicial notice of adjudicative facts appearing in newspapers." *See Crowder v. Kitagawa*, 81 F.3d 1480, 1492 (9th Cir.1996).

2

knit community in a highly regulated market, reputation means everything and word travels fast. *Id.*

Both the LT Game Group and SHFL products compete in the Macau market, and both companies have competing products in the market's electronic table systems ("ETS") segment. *See* Brandon Knowles Deposition Transcript ("Knowles Tr.") at 35:5-7, attached hereto as **Exhibit 3**. LT Game Ltd. ("LT Game"), LT Game International's licensor and business partner (hereinafter LT Game and LT Game International collectively "LT Game Group"), first entered the ETS market in 2006 with their LTMG and rapidly became the market leader. *Id.* at 25:10-17. Indeed, LT Game dominates the ETS segment, controlling more than 50% of the market share. *Id.* at 34:12-23. With terminals installed at gaming operations all across Macau, LTMG has had great success in the ETS market and enjoys a reputation of being innovative and well liked. *Id.* at 37:1-10 (describing LT Game as being the first to market and having a product customers like); *see also* Frank Feng Deposition Transcript, Vol. 1 ("Feng Tr. Vol. 1") at 159:23-160:2, attached hereto as **Exhibit 4**.

REDACTED.

Following its success in the Macau market, LT Game began focusing on expanding to other countries, including the U.S. *Id.* at 48:1-51:8; *see also* Feng Tr. Vol. 1 at 61:20-62:8, **Exhibit 4**. **REDACTED.**

**REDACTED.** In fear of losing market share to LT Game, SHFL took action. But instead of competing with LT Game on the merits, by making its product or pricing more competitive, SHFL engaged in an unscrupulous, international campaign of unfair competition. *See* **Exhibit 1**; *see also* Gavin Isaacs Deposition Transcript ("Isaacs Tr.") at 39:22-41:17; 45:24-47:1; **REDACTED**; Feng. Decl. ¶¶ 8-11 (explaining false statements made to customers); Jay Chun Deposition Transcript ("Chun Tr.") at 51:2-52:17, 70:8-71:25; 62:20-63:5, attached hereto as **Exhibit 6**; Knowles Tr. at 170:6-174:14 (hereinafter collectively "evidence of Defendant's unlawful acts"), **Exhibit 3**.

**B.    SHFL embarks on an international campaign of unfair competition**

Over the past few years, SHFL has systemically been unfairly competing with LT Game in gaming markets throughout the world.  *See id.*  Through the use of threats, disparagement of the LT Game brand and its products, and direct and indirect interference with LT Game International's business contacts and prospective customers, SHFL has succeeded in damaging LT Game International's deals and prospective deals.  *See* Meister Report at 6-7; Feng Decl. ¶¶ 8-13, 20-28; A Preliminary Analysis of Economic Damages ("Giuffre Report") attached to the Declaration of Dennis M. Giuffre ("Giuffre Decl."), filed concurrently herewith..   SHFL's ambitious early efforts began in 2009 when it attempted to coerce and threaten LT Game president Jay Chun into giving SHFL its valuable patents.  *See* Chun Tr. at 51:2-52:17, 70:8-71:25 (explaining SHFL's patent pool proposals in 2009 and 2012), **Exhibit 6**.  SHFL has twice tried to strong arm LT Game into entering a shared patent pool, where LT Game would put all of its patents and SHFL would put nothing valuable.  *See id.*  Chun was told that if he agreed, SHFL would provide him with protection, and if he refused, SHFL would exhaust LT Game through litigation.  *See id.*  Despite mafia-like offers of protection and threats of litigation, Chun refused to give LT Game's intellectual property to SHFL.  *Id.* at 52:13-17.

**C.    SHFL engages in coercion and unfair competition at the 2012 G2E Asia Tradeshow**

After the failed attempt to get direct access to LT Game patents, SHFL resorted to other tactics, including acts of unfair competition at the 2012 G2E Asia trade show.  *Id.* at 55:14-59:18.   Regarded as one of the premier global gaming events, both LT Game and SHFL participated by showcasing their products at the event.  *See* Feng Tr. Vol. I. at 195:6-15, **Exhibit 4**.  Likewise, several gaming executives, including current and potential customers, attended.  *Id.*  Prior to the show, LT Game learned that SHFL was planning to display a product believed to infringe its Macau patent and went to the court to file an injunction.  *See* Chun Tr. at 53:1-9, **Exhibit 6**.  **REDACTED**; *see also* Declaration of Pedro Cortés ("Cortés Decl.) ¶ 4, filed concurrently herewith.

Angered that it would not be able to display its infringing product, SHFL retaliated.  *See* Chun Tr. at 55:14-59:18, **Exhibit 6**; *see also* Andrew Scott Deposition Transcript ("Scott Tr.") at 19:8-10, attached hereto as **Exhibit 7**.  Demonstrating a complete lack of respect for the Macau legal system, SHFL circumvented the appropriate channels and took matters into its own hands.  **REDACTED.**  The ultimatum also required LT Game to not enforce its legal rights against potential infringers within two months of every future G2E show.  *See* Chun Tr. at 56:4-12, **Exhibit 6**.  In addition, a metal barrier was placed around LT Game's booth, blocking off all contact with visitors.  *See id.* at 55:14-16; *see also* Scott Tr. at 29:16-21, **Exhibit 7**.

As a result, LT Game was denied access to customers and the right to display its product.  *See* Chun Tr. at 55:14-56:3, **Exhibit 6**.  Many customers, including Genting Group representatives, were present and witnessed these events.  *See id.* at 57:5-8; *see also* Scott Tr. at 17:11-18, **Exhibit 7**.  The controversy caused game show attendees to question LT Game Group's reputation.  *See* Scott Tr. at 41:16-19; 42:14-16, **Exhibit 7**; Meister Report at 5-6.  To try to mitigate the damage already caused and prevent further harm, LT Game had no choice but to drop the injunction.  *See* Chun Tr. at 60:11-20, **Exhibit 6**.

**D.    The aftermath of the 2012 G2E Asia--the Genting Group deal falls through REDACTED.**

A day later things fell apart.  After witnessing the events caused by SHFL on the first day of the 2012 G2E Asia, **REDACTED**.

**E.    SHFL's misrepresentations permeate the gaming community**

Even after the 2012 G2E Asia, SHFL continued to misrepresent LT Game to members of the gaming community.  *See* Feng Decl., ¶¶ at 8-11.  **REDACTED**.

**REDACTED**.

Through their misrepresentations, SHFL has successfully disparaged the LT Game brand throughout the entire gaming community.  **REDACTED**.

### F.      SHFL's international campaign of unfair competition continues

SHFL's unscrupulous method of competition has not gone unnoticed.  The company currently faces two criminal investigations and has an outstanding civil appeal in Macau.[2]  *See* Cortés Decl. ¶¶ 5-7.  Still, as recent as July 2013, even after LT Game International filed this lawsuit, SHFL continues to violate and disregard U.S. and Macau law by making misrepresenting about LT Game's product and brand to customers and prospective customers and displaying infringing products.  *See id.* ¶ 3; Feng Decl. ¶¶ 8-11.  SHFL's demonstrated inability to compete with LT Game on the merits of its product has led it to destroy LT Game's reputation at every opportunity.  SHFL's continued unlawful attempts to keep LT Game's successful LTMG out of the global gaming market have caused LT Game International damage. *See* Meister Report at 6-7.  The Court should deny Defendant's motion for summary judgment.

## III.    ANALYSIS

### A.      Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavit shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).   Thus, summary judgment is inappropriate when there is a genuine issue of material fact. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  The moving party has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Additionally, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party*." Calderone v.*

---

[2]      Contrary to Defendant's assertion, the Preliminary Hearing Court in Macau did find SHFL guilty of deliberate patent infringement.  Cortés Decl., ¶ 5.  This is not a false representation.  Plaintiff provided a certified translation of the order and SHFL provide no alternative translation. *Id.*, ¶¶ 5-6.

*United States,* 799 F.2d 254, 259 (6th Cir.1986); *Marvik v. Neigh2bors*, No. 3:11–CV–00655–LRH–WGC, 2013 WL 6008201, at *2 (D. Nev. Nov. 12 2013).   The nonmoving party is entitled to all justifiable inferences in its favor and "at the summary judgment stage the judge's function is not himself to weigh evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) ([C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge"); *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009).   "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.*" Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997).

**B.    SHFL's actions constitute unfair competition under Nevada common law, Macau law, and the federal Lanham Act**

Defendant's motion aggregates Plaintiff's Lanham Act, common law, and Macau's statutory unfair competition claims (Counts I-III), suggesting that the same legal principals govern each.  Def. Mot. Summ. J., 19:17-20:3.  Defendant's motion fails to address Plaintiff's distinct claims, instead relying on two trademark infringement cases to conclude that Nevada analyzes all unfair competition claims the same.[3]  *Id.* at 19:21-20:3.  Conveniently, Defendant seeks to apply only the most restrictive set of elements to all of Plaintiff's claims.  Def. Mot. Summ. J., 19:17-19:21 (applying Lanham Act section 43(a) elements to all claims).  Contrary to Defendant's assertion, however, Plaintiff's common law unfair competition claim and Macau unfair competition claim are distinct.   Under Nevada law, the tort of unfair competition is "extremely flexible, and courts are given wide discretion to determine whether conduct is 'unfair.'" *Golden Nugget, Inc. v. American Stock Exchange, Inc.*, 828 F.2d 586, 591 (9th Cir. 1987); *Custom Teleconnect, Inc. v. International Tele-Services, Inc.*, 254 F.Supp.2d 1173, 1182

---

[3]     Defendant cites *Caesars World, Inc. v. Milanian*, 247 F. Supp.2d 1171, 1193 (D. Nev. 2003) as "recognizing that the elements of a claim for unfair competition under Nevada common law 'are identical to the elements necessary under section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).'  The entire sentence from *Caesars World* reads: "The elements necessary to make out a claim of Nevada common law **trademark infringement** are identical to the elements necessary under section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)." **This is not a trademark infringement case.**

(D. Nev. 2003) (declining to limit common law unfair competition to passing off). "It would be impossible to draft in advance detailed plans and speculations of all acts and conduct to be prohibited...since unfair and fraudulent business practices may run the gamut of human ingenuity and chicanery." *People ex rel. Mosk v. National Research Co. of Cal*., 201 Cal. App. 2d 765, 772 (Dist. Ct. App. 1962)*; Barquis V. Merchants Collection Assn*., 7 Cal. 3d 94, 112 (1972) (describing "unfair competition" in a California statute as "establish[ing] only a wide standard to guide courts of equity...given the creative nature of the scheming mind.").

Moreover, the law of unfair competition is responsive to changing conceptions of what is wrong. *See Ely-Norris Safe Co. v. Mosler Safe Co.*, 7 F.2d 603, 604 (2d Cir. 1925) (L. Hand), *rev'd on other grounds*, 273 U.S. 132 (1927) ("There is no part of the law which is more plastic than unfair competition, and what was not recognized an actionable wrong twenty-five years ago may have become one today."). The legal standard of fairness is ultimately a reflection of sociological, economic, moralistic, and ethical concepts of fairness. McCarthy at §1.8. As a result, "the meaning of the term ["unfair competition"] is fluid, having been refined on a case-by-case basis over more than a century," and therefore is not susceptible to an "overall, sweeping definition." *Id.* Because unfair competition is an evasive and hard to define concept, Judges often analyze commercial behavior by drawing from his or her own conceptions of fairness, morality and honesty. *See* McCarthy §1.9.

While it is "impossible to state a definitive test for determining which methods of competition will be deemed unfair," case law and treatises provide guidance. McCarthy on Trademarks and Unfair Competition, 4th ed. at §1.8 (the law of unfair competition is largely found in case law precedent); Restatement (Third) of Unfair competition §1 (analyzing case examples). The Restatement (Third) of Unfair Competition § (1995) acknowledges the open-ended nature of the tort by articulating various types of common law unfair competition. *See* Restatement (Third) of Unfair Competition §1. Importantly, the Restatement recognizes that the traditional categories of liability do not fully exhaust the scope of statutory or common law liability of unfair competition, and therefore includes a residual category encompassing other business practices determined to be unfair. *See* Restatement (Third) of Unfair Competition §1,

comment g.  Thus, under the Restatement, one is liable for unfair competition where harm results from acts relating to deceptive marketing, infringement of trademarks or other indicia of identification, appropriation of intangible trade values including trade secrets and the right of publicity, "*or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.*"  Restatement (Third) of Unfair Competition §1 (emphasis added).

Further, the Restatement provides that: "if conduct is likely to interfere in a substantial manner with the ability of prospective purchasers to choose on the merits of the competing products, it will ordinarily be considered unfair."  *Id.; See also Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 691 (D. Md. 2012).

In analyzing unfair competition claims, courts have repeatedly rejected the argument that common law unfair competition is coextensive with the Lanham Act.  *See, e.g., Giordano v. Claudio*, 714 F.Supp.2d 508, 528 (E.D. Penn. 2010) (applying the Restatement (Third) of Unfair Competition and recognizing a claim where the defendant wrote a letter to a university denigrating the plaintiff researcher's reputation); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 691 (D. Md 2012) (rejecting a narrow definition of unfair competition).  Moreover, the breadth of conduct illustrated in case law demonstrates unfair competition law's broad scope.  *See McCarthy* citing *Gardiner v. Gendel*, 727 F. Supp. 799, 805 (E.D.N.Y. 1989) (sending meritless cease and desist letters alleging patent infringement); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55-56 (1st Cir. 1998) (ordering goods without intending to pay for them); *Hutcherson v. Alexander*, 264 Cal. App. 2d 126, 70 Cal. Rptr. 366 (5th Dist. 1968) (chasing plaintiff's employee who was passing out free refreshment tickets and constructing a high fence to block off customers' view of plaintiff's store and blocking traffic from coming into plaintiff's business).

Unfair competition under Macau law is similarly broad.  Macau Com. Code, Chap. II, Art. 162.  Article 162 provides that: "The making or broadcast of statements on the enterprise, products, services, or commercial relations of competitors, which are apt to diminish their credit

9

in the market, is considered unfair except that they are exact, true and pertinent." *See id.*  Thus, Macau law covers a wide variety of statements made about different aspects of a business.

In this case, Defendant's international campaign of disparagement and widespread attempt to keep LT Game International from bringing the successful LTMG to the U.S. market constitutes unfair competition.  Remarkably, defendant fails to acknowledge one of its most egregious acts, causing the controversy and embarrassment to LT Game at the 2012 G2E Asia. **REDACTED.**

The controversy at the 2012 G2E Asia started on May 22, 2012 when SHFL took the law into its own hands, ignoring a court order and used undue influence to direct the organizers of the show to coerce Plaintiff into relinquishing its intellectual property rights.  *See id.*

LT Game's booth was barricaded with a metal fence and trade show organizers threatened to shut down its vitally important power supply.  *See* Chun Tr. at 57:7-8, **Exhbit 6**; Ex. 2, Knowles Tr. at 170:6-174:14, **Exhibit 3**.  Jay Chun was told to make an application to withdraw the court order and effectively relinquish his intellectual property rights or LT Game would be evicted.  *See id.*  LT Game's important customers, including the Genting Group, witnessed LT Game's fenced off booth.  *See* Chun Tr. at 57:7-8, **Exhibit 6**.

**REDACTED.**  In sum, Defendant's actions caused the controversy and embarrassment that LT Game International sustained.

**REDACTED.**

**REDACTED.**  .

SHFL's unfair competitive acts did not end at the 2012 G2E Asia.  **REDACTED.**

**REDACTED.**

**C.     LT Game International's evidence supports its Lanham Act unfair competition claim**

The evidence in this case supports a finding of unfair competition even under Defendant's narrow and self-serving conception.  Section 43(a) of the Lanham Act provides protection against a "myriad of deceptive commercial practices," including false advertising or promotion.  *Resource Developers v. Statue of Liberty–Ellis Island Found.*, 926 F.2d 134, 139

(2d Cir.1991).  Moreover, this section "has been characterized as a remedial statute that should be broadly construed."  *See Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996).  The elements of a false advertising claim under section 43(a) are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1139 (9th Cir. 1997).

SHFL's statements that the LTMG infringes its U.S. patents and cannot be sold outside of Macau are actionable false statements.  The Ninth Circuit describes puffery as "exaggerated advertising, blustering and boasting upon which no reasonable buyer would rely."  *Southland Sod Farms*, 108 F.3d at 1145.  In contrast, a misdescription of specific or absolute characteristics is not puffery.  *See Cook, Perkiss and Liehe, Inc*. v. *Northern California Collection Services Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).  Numerous courts have held that marketplace misrepresentations of patent infringement are actionable.  *See e.g*., *Cummins-Allison Corp. v. Glory, Ltd*., No. 02 C 7008, 2003 WL 22169756, at *2 (N.D. Ill. Sept. 18, 2003) ("Allegations that a party falsely represented to a business's customers that the business was infringing on the party's patent rights will support claims for unfair competition under the common law and the Lanham Act"); *Minebea Co., Ltd. v. Papst*, 13 F. Supp.2d 35, 44 (D.D.C. 1998); *Laser Diode Array, Inc. v. Paradigm Lasers, Inc*., F. Supp. 90, 95 (W.D.N.Y.1997); *Laitram Machinery, Inc. v. Carnitech A/S*, 901 F. Supp. 1155, 1162 (E.D. La 1995).

Here, Defendant recites the law of puffery and vaguely asserts that Plaintiff's statements are not actionable, but utterly fails to explain why.  Without question, the baseless misrepresentations made by SHFL to LT Game International's customers are actionable. Courts have repeatedly held that similar misrepresentations of patent infringement are actionable.  Further, SHFL's misrepresentation that the LTMG cannot be sold outside of Macau

is not puffery as it describes specific and absolute qualities: the product either can or cannot be sold outside of Macau. Moreover, LT Game International's customers relied on these statements. *See* Feng Decl., ¶¶ 8-13.

Advertising and promotion extends beyond traditional advertising campaigns. *See Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 112 (6th Cir. 1995). Further, determining whether a communication is considered "advertising or promotion" is fact specific and often turns on the nature of the industry. *Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1385 (5th. Cir. 1996) (element satisfied by sales presentations to eleven independent bottlers); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc*., 880 F. Supp. 1005, 1021 (S.D.N.Y. 1994) (holding that a single letter from a manufacturer to a potential customer could constitute "advertising or promotion"). If an industry is small and closely connected, direct communication with individual purchasers can satisfy this element. For example, in *National Artists Management Co. v. Weaving*, defendant's telephone calls to ten people satisfied the "advertising or promotion" requirement because services in the theater industry were promoted by word of mouth and the industry was small and closely interconnected. *Nat'l Artists Mgmt. Co., v. Weaving*, 769 F. Supp. 1224, 1234-35 (S.D.N.Y. 1991).

In this case, Defendant has directly made disparaging misrepresentations about LT Game International's products and services to several of Plaintiff's potential customers. *See* Feng Decl. ¶¶ 8-13. As in *National Artists Management*, the gaming industry is admittedly small and interconnected and word of mouth promotion is widely used. Therefore, the communications satisfy this element.

### D. Defendant caused Plaintiff irreparable harm by intentionally interfering with prospective deals

Defendant's contention that LT Game international lacks evidence to support this claim is unavailing. Under Nevada law, to succeed on a claim for interference with prospective economic advantage a plaintiff must prove: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or

justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *Wichinsky v. Mosa,* 847 P.2d 727, 729–30 (Nev. 1993). Additionally, "a plaintiff must show that the means used to divert the prospective advantage was unlawful, improper or was not fair and reasonable." *Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1181 (D. Nev. 2003).

Under the related claim of intentional interference with contractual relations, the knowledge element is satisfied if plaintiff can demonstrate that defendant knew of the existing contract or can establish "facts from which the existence of the contract can reasonably be inferred." *Nat. Right to Life P.A. Com. v. Friends of Bryan*, 741 F. Supp. 807, 813 (D. Nev. 1990). Intent to harm can be established if a defendant knowingly directs false statements at a plaintiff's prospective customer. *Arsenal, Inc. v. Neal*, No. 2:11–cv–01628–KJD–CWH, 2013 WL 2405289, at *4 (D. Nev. May 31, 2013). Further, In *Arsenal v. Neal*, a manufacturer of firearms filed a complaint and subsequent motion for summary judgment against defendant, who published YouTube reviews of firearms, for damage caused by the misstatements. *Id.* at *1. Two of defendant's reviews included false statements about plaintiff's products. *Id.* The videos included a product test and falsely stated that Arsenal's firearms were not "combat ready." *Id.* Plaintiff sent defendant a cease and desist letter but defendant refused to remove the videos from YouTube. *Id.* Collectively, the videos were viewed over 35,000 times. *Id.* The Court granted plaintiff's motion, holding that defendant was aware of plaintiff's prospective buyers because his product reviews were directed to prospective rifle buyers and defendant intended to damage plaintiff's relationships because he knew the videos were inaccurate yet continued to show them. *Id.* at *4.

Here, there is no question SHFL interfered with LT Game International's prospective deals, often making repeated attempts at derailing LT Game International's entry into the U.S. market. **REDACTED.**

**REDACTED.** As in *Arsenal*, where the defendant knowingly directed false statements at prospective customers, SHFL knowingly directed false statements to Plaintiff's prospective customers. LT Game International suffered actual harm as the result of SHFL's actions, as

Plaintiff's prospective deals were either stalled or halted after customers expressed concern over Defendant's misrepresentations and controversy at the 2012 G2E Asia. *See generally*, Giuffre Decl., attached expert report and supplemental reports; Meister Report; Feng Tr. Vol. II. at 86:20-25, **Exhibit 9.**; Feng Decl., ¶¶ 12-13, 24-29. **REDACTED.**

**REDACTED.** Defendant's argument that it is not liable because LT Game International gave its business to LT Game International U.S. is meritless. **REDACTED**.

**E.    Defendant's persistent argument that LT Game International needs a license to conduct business is false and frivolous**

Defendant's opinion that LT Game International needs a license to be injured is false and frivolous. First, a license is not a prerequisite to a prospective deal. *See* Rumbolz Tr. at 45:18-25, **Exhibit 8**; Feng Decl. ¶ 30. Different jurisdictions have varying gaming product manufacturing and distribution licensing requirements. *See* Feng Decl. ¶ 30. In Australia and Malaysia, only a casino operator can apply for a license. *See id.* Melco Crown Australia obtained a license to install LT Game products in Australia. *See id.* In California, deals can be made while an application is pending. *See id.* LT Game International has closed a deal with Commerce Casino while its application for gaming product manufacturing and distribution is pending. *See id.* Thus, an entity need not have a license to be injured. In this case, LT Game International had prospective deals with casinos in the U.S. and abroad and has since closed numerous deals. Feng Tr. Vol. I. at 69:16-70:1 and 132:12-19, **Exhibit 4**; Feng Decl. ¶¶ 20-22. That is all the law requires.

Second, Defendant's argument is at odds with the customs and norms of this industry. A prospective deal happens before an entity can apply for a license. *See* Rumbolz Tr. at 45:18-25, **Exhibit 8**. Licenses and the application process are very expensive, making the process illogical absent a prospective deal based on serious interest. *See id.* at 40:7-24; 41:16-21. Moreover, many jurisdictions, including California and Nevada, *require* a prospective sponsorship deal before they will even consider an application for a license. *See id.* 46:3-11 ("In California you--you need a sponsor to have your equipment tested before you can get any approval from the State"); Knowles Tr. at 60:6-8, **Exhibit 3**. Defendant's own expert agrees

that this arrangement is an industry custom.  *See* Rumbolz Tr. at 40:7-24, 41:16-21, **Exhibit 8**.
Any argument to the contrary is misleading, irrelevant, and not material.

An additional industry norm further obviates the need for a company to obtain a license.
Gaming market participants often enter deals through agents and partners.  *See* Feng Decl. ¶¶
16-18, 30.  **REDACTED.**  In sum, whether or not LT Game International has a license has no
bearing on whether it has or will suffer an injury as a result of SHFL's actions.

### F.   Plaintiff's has presented admissible evidence and evidence currently in an inadmissible form can be presented through direct testimony at trial

Contrary to Defendant's contention, Plaintiff has submitted sufficient admissible
evidence.  The Supreme Court instructed in *Celotex Corp. v. Catrett* that the nonmoving party
need not produce evidence "in a form that would be admissible at trial in order to avoid survive
summary judgment."  *See Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478,
485 (9th Cir. 1992) *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If "the non-
moving party's evidence is presented in a form that is currently inadmissible, such evidence
may be evaluated as long as the objections could be cured at trial."  *Fraser*, 342 F.3d at 1036-37
(holding that the content of Plaintiff's diary was admissible because declarant could testify at
trial); *Haack v. City of Carson City*, No.3:11-cv-00353-RAM 2012 WL 3638767, at *6 (D.
Nev. 2012).  "Obviously, Rule 56 does not require the nonmoving party to depose her own
witnesses."  *Celotex Corp.*, 477 U.S. at 324.

Hearsay evidence produced in an affidavit may be considered on summary judgment if
the declarant could later present the evidence through direct testimony.  *See ISG Insolvency
Group, Inc. v. Meritage,* No. 2:11-CV-01364-PMP-CWH 2013 WL 3043681, at *3-4 (D.
Nev. June 17, 2013); *Fonesca v. Sysco Food Services of Arizona, Inc.,* 374 F.3d 840, 846-47
(9th Cir. 2004) (concluding that hearsay evidence could be presented in admissible form at
trial); *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) *citing J.F. Feeser, Inc. v. Serv-A-
Portion, Inc.*, 909 F.2d 1524, 1542 (3rd. Cir. 1990).  In *ISG Insolvency Group*, this Court held
that "at the summary judgment stage, the Court does "not focus on the admissibility of the
evidence's form.  [The Court] instead focus[es] on the admissibility of its contents."  *See ISG*

*Insolvency Group, Inc.*, 2013 WL 3043681, at \*3-4, *citing, Fraser*, 342 F.3d at 1037.  Evidence is admissible for summary judgment purposes it if could be presented "in an admissible form at trial." *See id.*, *citing, Fonesca*, 374 F.3d at 846.  Because Plaintiff could present evidence in an admissible form at trial, through testimony of employees who kept the records, the testimony was admissible on summary judgment.  *See id.*

In *J.F. Feeser*, plaintiff, a wholesale food distributor, sued defendant alleging Sherman Act violations.  *J.F. Feeser, Inc.*, 909 F.2d at 1526.  A buyer was deposed and made statements based on information his sales force had told him.  *Id.* at 1542.  The lower court held that the buyer's statements were inadmissible hearsay.  *Id.*  The Court of Appeals reversed, reasoning that there was no indication the buyer's sales force would be unable to testify at trial, and therefore the statements could be reduced to admissible evidence at trial.  *Id.*

Here, all the evidence related to the controversy at the 2012 G2E Asia is admissible, which consists of first-hand knowledge of LT Game International's witnesses and admissions by SHFL CEO Isaac and 30(b)(6) witness Knowles.  Additionally, as in *J.F. Feeser*, hearsay objections to statements made to Plaintiff by its customers can be proffered in admissible evidentiary form at trial through direct testimony of the witnesses and as the U.S. Supreme Court and the Ninth Circuit have made clear need not be in an admissible form for the purposes of consideration by this Court at the summary judgment stage.  *See, e.g.* Cite Celotex and two Ninth circuit cases.  **REDACTED.**  *See* Feng Decl., ¶¶ 8-11.  **REDACTED.**  Defendant had the opportunity to depose witnesses listed by LT Game International, yet chose not to.

G.     **LT Game International's damage evidence is sufficient to survive summary judgment**

Contrary to Defendant's assertions, Plaintiff's damages are not speculative, but rather based on an analysis conducted by an expert witness based on contractual agreements and sales figures from negotiations with actual customers.  A plaintiff who successfully establishes a violation of § 43(a) is entitled to recover, "subject to the principles of equity, ... (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (Lanham Act § 35(a)); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145

(9th Cir. 1997).  Even a "plaintiff's inability to show actual damages does not preclude recovery for Lanham Act false advertising claim."  *Lindy Pen Co. v. Bic Pen Corp.*, *982 F.2d* 1400, 1411 (9th Cir. 1993).  Because of the difficulty in proving actual damages in a false advertising case, the Lanham Act allows a court, "subject to the principles of equity," to award damages based on the defendant's profits on an unjust enrichment theory.  15 U.S.C. §1117 (a); *Lindy Pen Co.*, 982 F.2d at 1407; *Del Webb Communities, Inc. v. Partington*, 208-CV-00571-RCJ-GWF, 2009 WL 3053709, at *17 (D. Nev 2009).  A plaintiff need only prove defendant's sales and the defendant must prove costs or deductions.  15 U.S.C. §1117(a).  Further, upon proving causation, the plaintiff's evidentiary burden relaxes considerably.  *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105, 1112 (9th Cir. 2012).  Thus, to support an actual damages award, there need only be substantial evidence to permit a factfinder to draw *reasonable inferences* and make a *fair and reasonable assessment.  Id.*; *see also*, *La Quinta Corp. v. Heartland Properties LLC,* 603 F.3d 327, 342 (6th Cir. 2010).  This evidence can be presented in form of a damages expert.  *Del Webb Communities, Inc.*, 2009 WL 3053709, at *19.

Here, Plaintiff has provided damages evidence calculated by a qualified expert economist with over thirty years experience.  *See* Giuffre Report at 3-4.  **REDACTED.**  It is unclear why Defendant asserts that Plaintiff's damages calculation is based on an antiquated marketing presentation that predates this controversy, is wholly irrelevant, and was not even considered in Mr. Giuffre's analysis.  Mr. Giuffre's analysis, which is based on facts relevant to this dispute, is sufficient to assist a factfinder in calculating damages.

Plaintiff also claims damages under a theory of unjust enrichment.  Under this theory, Plaintiff need only prove Defendant's sales.  **REDACTED**.

### H.    Defendant's argument that LT Game International lacks standing is untenable

Article III standing of the United States Constitution "is required to establish a justiciable case or controversy within the jurisdiction of the federal courts."  *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011).  To establish Article III standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Henry v. Circus Casinos, Inc.*, 223 F.R.D. 541, 543 (D. Nev. 2004). Satisfying these three elements ensures a plaintiff has a personal stake or interest in the outcome of the proceedings. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Article III's injury in fact element requires only an "identifiable trifle of harm," not an actual harm. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 (1973). Thus, even a threat of injury can be sufficient to establish an injury in fact under Article III. *See Central Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002). Further, merely creating a chain of inferences showing how a defendant's misrepresentations could harm the plaintiff's business can satisfy the injury in fact requirement. *See TrafficSchool.com*, 653 F.3d at 825 (concluding that misrepresentations would tend to increase defendant's market share at plaintiff's expense because consumers tended to view the association created by defendant's misrepresentation favorably).

The factually inapposite Third Circuit case Defendant attempts to apply simply does not fit. *See* Def.'s Mot. 15:7-16:2. *Joint Stock Society* involves a foreign product with no presence in defendant's U.S. market. *Joint Stock Society v. UDV N. Amer.,* 266 F.3d 164, 177 (3rd. Cir. 2001). Moreover, though the court characterized the injury as being "conjectural or hypothetical," it explained that had plaintiff been poised to ship its vodka to the United States, it might have successfully showed it faced an "imminent" threat of injury sufficient to satisfy Article III's injury in fact requirement. *Id.*

This injury in this case far exceeds what Article III requires. Unlike *Joint Stock Society*, LT Game International is not some unknown entity with no intention of entering Defendant's market. *See* Knowles Tr. at 43:9-12, **Exhibit 3**. **REDACTED.** Defendant's attempt to use Plaintiff's injury to its advantage by arguing that LT Game International gave the U.S. market to LT Game International U.S. is untenable. **REDACTED.**

1       Defendant's prudential standing argument is unavailing for two reasons.   First, LT

2 Game International is only raising claims on behalf of itself with respect to damages it itself

3 sustained on account of SHFL's actions.   *See* Proposed Second Am. Compl., **Exhibit 1;** Feng

4 Decl., ¶¶ 8-13, 24-29.  **REDACTED.**

5       Second, Defendant's assertion that it was necessary to add LT Game International U.S.

6 as a plaintiff is equally unavailing.  **REDACTED**.  In sum, Plaintiff meets the Constitutional

7 and prudential standing requirements.

8 **III.     CONCLUSION**

9       Based on the foregoing, Defendant's motion should be denied in its entirety.

10       RESPECTFULLY SUBMITTED this 12th day of December, 2013.

11                   MEREDITH & KEYHANI, PLLC

12               By:  */s/ Dariush Keyhani*

DARIUSH KEYHANI (DK9673) (*pro hac vice*)

13                     330 Madison Avenue, 6th Floor

New York, New York 10017

14                     Telephone:     212.760.0098

Direct Dial:    646.536.5692

15                     Facsimile: 212.202.3819

Email:    dkeyhani@meredithkeyhani.com

16

17                     JACQUELYN S. LELEU, ESQ. (NSBN 7675)

AMANDA C. YEN, ESQ. (NSBN 9726)

JOSEPH P. SCHRAGE, ESQ. (NSBN 11270)

18                     McDONALD CARANO WILSON LLP

2300 W. Sahara Avenue, Ste. 1200

19                     Las Vegas, NV  89102

Telephone:702.873.4100

20                     Facsimile: 702.873.9966

21                     *Attorneys for Plaintiff LT Game*

*International Ltd.*

22 LVDOCS-#294217

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2       I HEREBY CERTIFY that I am an employee of McDonald Carano Wilson LLP, and

3  that on the 12th day of December, 2013, a true and correct copy of the foregoing

4  **DECLARATION OF ALAN P. MEISTER, PHD.** (**FILED UNDER SEAL**) was

5  electronically filed with the Clerk of the Court by using CM/ECF service and a copy of the

6  same was deposited in the U.S. Mail, postage prepaid, on the parties and at the addresses listed

7  below:

8              Christopher Miltenberger, Esq.
              PISANELLI BICE, PLLC
9              3883 Howard Hughes Parkway, Suite 800
              Las Vegas, Nevada 89169
10             Email:  crm@pisanellibice.com

11             *Attorneys for Defendants*

12

13

14                                              */s/ Della Sampson*
                                               An employee of McDonald Carano Wilson LLP
15

16

17

18

19

20

21

22

23

24

25

26

27

28