1  James J. Pisanelli, Esq., Bar No. 4027
   JJP@pisanellibice.com
2  Christopher R. Miltenberger, Esq., Bar No. 10153
   CRM@pisanellibice.com
3  Eric T. Aldrian, Esq., Bar No. 11897
   ETA@pisanellibice.com
4  PISANELLI BICE PLLC
5  3883 Howard Hughes Parkway, Suite 800
   Las Vegas, Nevada  89169
6  Telephone:  (702) 214-2100
7  Facsimile:  (702) 214-2101

8  *Attorneys for SHFL entertainment, Inc.,*
   *f/k/a Shuffle Master, Inc.*

9

10                  **UNITED STATES DISTRICT COURT**

11                        **DISTRICT OF NEVADA**

12  LT GAME INTERNATIONAL LTD.,          Case No.: 2:12-cv-01216-JAD-GWF

13                    Plaintiff,

14  vs.                                  **REPLY IN SUPPORT OF**
                                         **MOTION FOR SUMMARY JUDGMENT**
15  SHUFFLE MASTER, INC.,

16                    Defendant.

17

18  **I.    INTRODUCTION**

19        Plaintiff LT Game International, Ltd.'s ("LT Game International") response to Defendant

20  SHFL entertainment, Inc. f/k/a Shuffle Master, Inc.'s ("SHFL") Motion establishes why summary

21  judgment is appropriate in this case.  LT Game International has produced *no* admissible evidence

22  (really, no evidence at all) to support its claims against SHFL.  The unrefuted, admissible

23  evidence presented in SHFL's Motion demonstrates that SHFL has not engaged in unfair

24  competition or intentional interference in any manner.

25        Faced with this reality, LT Game International turned to self-serving, inadmissible hearsay

26  and, more troubling, misrepresented testimony from SHFL's employees regarding non-actionable

27  statements in response to the Motion.  Indeed, LT Game International has not produced any

28  admissible evidence that SHFL made misrepresentations or disparaged LT Game International to

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

any of its prospective customers, nor can it.  Similarly, LT Game International has produced no evidence at all that SHFL purportedly used "undue influence" or otherwise directed the organizers of G2E Asia 2012 to interfere with the booth of a non-party to this action (LT Game Ltd. ("LT Game")).  Instead, the evidence in this case only reveals that once non-party LT Game used unfair tactics to obtain an *ex parte* injunction to interfere with the booth of one of SHFL's subsidiaries at that show, SHFL informed the show's organizers that LT Game's actions were "unacceptable" and that the parties' longstanding patent dispute should be handled in a court of law, not on the floor of one of the gaming industry's biggest shows of the year.  That is all.

Nevertheless, Plaintiff LT Game International filed this lawsuit alleging that SHFL had unfairly competed and interfered with its prospective customers.  It promised that discovery in this case would confirm all the outlandish accusations in its pleadings, but has not.  Discovery has now closed and LT Game International has confirmed only that this case should never have been filed in the first place.  There is neither smoke nor fire.  There is only a litigant seeking to help a non-party to this action, LT Game, gain leverage for a broader patent dispute with SHFL and its subsidiaries.  And, because LT Game International has been unable to produce evidence to support its spurious allegations (because none exists), the Court should enter summary judgment against Plaintiff on each and every claim brought in its First Amended Complaint.[1]

## II.   RESPONSE TO LT GAME INTERNATIONAL'S "FACTS IN DISPUTE"

In an attempt to create the *appearance* of a genuine issue of material fact, LT Game International files a lengthy statement of purported "facts in dispute."  While some of the "facts" therein are disputed between the parties, none of them are material to the resolution of this matter or otherwise preclude entry of summary judgment.  For instance, while the longstanding patent

---

[1]   Strangely, LT Game International cites to its proposed Second Amended Complaint and the allegations contained therein in support of its Opposition.  However, the Second Amended Complaint is not the operative pleading in this action.  As explained in the Motion, on January 31, 2013, LT Game International moved for leave to file its proposed Second Amended Complaint. (Dkt. #37, Mot. for Leave to Amend.).  SHFL opposed the request based on, among other reasons, the futility of the amendment. (Dkt. #42, Opp. Mot. Leave to Amend.)  The Court has not granted LT Game International leave to file the Second Amended Complaint.  Accordingly, the First Amended Complaint is the operative pleading. Regardless, even if this Court were to grant LT Game International leave, summary judgment would still be appropriate as to the Second Amended Complaint for the same reasons set forth herein.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

dispute between SHFL's subsidiaries and non-party LT Game in Macau may be helpful to the Court for background purposes, which is why SHFL briefly touched upon it in the Motion, that separate dispute does not implicate or even support LT Game International's claims for relief in this action.  LT Game International's not-so-veiled attempt to avoid summary judgment by casting irrelevant and unsupported accusations fails under even the most basic scrutiny.

Another prime example of LT Game International's attempt to misdirect the Court and thereby avoid summary judgment is its repeated misrepresentation that SHFL was supposedly found "guilty" of infringing upon LT Game's or its affiliates' patent rights any criminal courts in Macau, or elsewhere. (Dkt. #94, Opp'n, 8:4-13, n.2.)  This assertion is patently false and simply made in plain bad faith.[2]  Hoping that the Court does not actually review the supposed "evidence" upon which it relies, LT Game International cites to nothing more than a statement based on LT Game's foreign complaint that indicates the "defendant *is accused of*" violating certain intellectual property rights purportedly held by the non-party to this action.  (Dkt. #90, Cortes Decl. at 5 (emphasis added)).  This is the equivalent of citing to an allegation in a complaint as "proof" that a defendant was found liable.  In reality, a trial was conducted on these allegations and SHFL was acquitted by the Macau court of those claims and SHFL was never found "guilty" of anything. (Dkt. #80, Mot., at Ex. B, 50:15-19.)  LT Game International's lack of candor to this Court does not create a genuine issue of material fact.

Notably, this same deceptive strategy is used throughout LT Game International's Opposition.  LT Game International apparently was banking on the hope that the Court would not actually look at the alleged "evidence" that LT Game International refers to in its briefing.  As yet another example of Plaintiff's misdirection is the newly created, self-serving Declaration of Linyi ("Frank") Feng.  For the most part, Feng simply disagrees with SHFL's legal argument that LT Game International has failed to establish its claims for relief in this case.  (*See, e.g.,* Dkt. #88,

---

[2]     Adding insult to injury, LT Game International attempts to give credibility to this false statement through the use of expert testimony from LT Game's litigation counsel in Macau. (Dkt. #90, Cortes Decl.) Mr. Cortes was never disclosed as a potential witness in this action, let alone an expert witness to support his purported opinions and incorrect interpretations of those Macau proceedings.  Accordingly, any declaration from Mr. Cortes should be excluded as inadmissible as further described in SHFL's evidentiary objections filed concurrently with this Reply.

1  Statement, 9:11-13:21 (Feng disputing that LT Game International has not specified its claims or

2  presented admissible evidence to support them ).) However, in a few instances, Feng proffers

3  new testimony that is contrary to his prior testimony in hopes of creating a genuine issue of

4  material fact. In one such instance, Feng now declares that LT Game International is still doing

5  business in the United States. (*Id.,* 14:1-4 (citing to Feng Decl.).) However, Feng previously

6  testified during his deposition to the exact opposite:



10  (Ex. C to Mot., Feng Dep., Vol. II, 22:7-12 (emphasis added).)

11  As another example, Feng disputes SHFL's claim that "LT Game International promised to

12  share 10% of its profits with LT Game US." (Dkt. #88, Statement, 5:17-19.) But, oddly, Feng

13  then admits in his Declaration and the Motion that "LT Game International was required to share

14  ten percent (10%) of its profit with LT Game International US." (*Id.* (citing Feng Decl.); Dkt.

15  #94, Opp'n, 14:2-3).

16  Of course, LT Game International cannot avoid summary judgment by producing a sham

17  declaration disputing prior testimony in this case. It is well-established in the Ninth Circuit "that a

18  party cannot create a material issue of fact on a motion for summary judgment by offering an

19  affidavit that 'flatly contradicts' the affiant's prior testimony." *Kennedy v. Allied Mut. Ins. Co.,*

20  952 F.2d 262, 266-67 (9th Cir. 1991); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544

21  (9th Cir. 1975); *see also id.* ("If a party who has been examined at length on deposition could

22  raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this

23  would greatly diminish the utility of summary judgment as a procedure for screening out sham

24  issues of fact."). Feng's Declaration is a nothing more than a sham based upon speculation and

25  conjecture, and should be stricken pursuant to Federal Rule of Civil Procedure 56.

26  Ultimately, LT Game International does not dispute the material facts in this case. It only

27  disputes SHFL's application of the law to the facts. As such, SHFL is entitled to summary

28  judgment on each of LT Game International's claims as a matter of law.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

III.   **DISCUSSION**

    A.    **LT Game International Lacks Admissible Evidence To Support Its Allegation That SHFL Made Misrepresentations To Customers.**

The Court's analysis necessarily begins with the fact that LT Game International lacks *any* admissible evidence to support its allegations serving as the basis of each of its claims that SHFL "made misrepresentations regarding Plaintiff's business and products . . . to Plaintiff's current and prospective customers in the gaming and casino industry," as set forth in the Amended Complaint. (Dkt. #14, Am. Compl. ¶ 13.) As this Court recently recognized, "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Romero v. Nevada Dept. of Corrections*, CV-808-JAD-VCF, 2013 WL 6206705, *3 (D. Nev. Nov. 27, 2013) (citing *Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980).

The only support LT Game International presents in support of its claim is its *own testimony* about what it heard from third parties about what those third parties allegedly heard from someone at SHFL. Such testimony is the epitome of hearsay, in fact triple hearsay, and presented without any personal knowledge. Specifically, LT Game International's Rule 30(b)(6) witness, Feng, testified that certain third parties told him that they "witnessed someone from Shuffle Master saying something disparaging about [LT Game International]." (Ex. G to Mot., Feng, Dep. Vol. I, 137:22-140:14.) However, Feng's testimony about what someone allegedly said to someone else constitutes rank inadmissible hearsay. *See* Fed. R. Evid. 801 (defining hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement").

In a failed attempt to get around the obvious inadmissibility of this testimony, LT Game International asserts that it is not required to produce admissible evidence at the summary judgment stage. (Dkt. #94, Opp'n, 20:7-21:21.) It argues that summary judgment is inappropriate when it is possible that LT Game International "could" present admissible evidence to support its

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

claims at trial.[3]   (*Id.*, 21:1-3.)   Of course, under that theory and misinterpretation of the law, summary judgment could never be granted because the nonmoving party would ***always*** claim that it is ***possible*** that it will secure and present evidence at trial.   Plainly, LT Game International is wrong on the law.

It is true that, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial."   *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).   However, the evidence in question must be capable of being presented "in an admissible form at trial."   *Fonseca v. Sysco Food Servs. of Ariz., Inc.* 374 F.3d 840, 846 (9th Cir. 2004).   In other words, evidence is only admissible for summary judgment purposes it "if could be presented 'in an admissible form at trial.'"   *ISG Insolvency Grp., Inc. v. Meritage Homes Corp.*, 2:11-CV-01364-PMP, 2013 WL 3043681, *3 (D. Nev. June 17, 2013) (citing *Fraser*, 342 F.3d at 1036).

The case of *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003) is illustrative.   There, the Ninth Circuit considered whether the plaintiff had presented admissible evidence to preclude entry of summary judgment.   The evidence in question in that case was plaintiff's own deposition testimony, which included testimony from the witness reading certain portions of her diary.   The defendant argued that the contents of the diary were inadmissible hearsay and thus could not be considered for purposes of the motion.   The Ninth Circuit ultimately disagreed because, although the contents of the diary may have been inadmissible hearsay, the plaintiff would be able to testify about the same things from memory at trial such that the evidence being offered (plaintiff's testimony) would not constitute hearsay.   In other words, although the contents of the diary may have been inadmissible, the plaintiff's testimony about the contents could be presented in an

---

[3]   LT Game International suggests in passing that it "may be able" to secure admissible evidence prior to trial in this case.   (*See* Dkt. #94, Opp'n, 21:17-18 (claiming that third-party witnesses "may be able to testify at trial.").)   Ironically, LT Game International said the same thing over a year ago, when SHFL and the Magistrate Judge pointed out the various defects in the Amended Complaint and LT Game International promised that "more information" and "more detail" would come out during discovery.   (Ex. R to Mot., Hr'g Tr. dated Jan. 24, 2013, 20:8-12, 31:4-7.)   The time to secure and present evidence in this case has passed.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1   admissible form at trial – namely, through her own testimony.  The Ninth Circuit thus instructed

2   the trial court to consider the testimony for purposes of summary judgment.

3       Here, the evidence that LT Game International asks this Court to consider to preclude

4   entry of summary judgment against it is Feng's testimony and that of his brother-in-law

5   benefactor, Jay Chun ("Chun").  Unlike the plaintiff in *Fraser* who could personally testify to the

6   contents of her diary after refreshing her recollection, Feng and Chun will ***never*** be able to testify

7   about what some third party allegedly heard from someone at SHFL.  This testimony contains

8   double, if not triple, hearsay that does not fall under any exception, and is therefore inadmissible

9   for any purposes at summary judgment.  *See Lucey v. City of Reno*, 3:04-CV-00637-BES-PAL,

10  2008 WL 821585, at n.2 (D. Nev. Mar. 27, 2008) ("double hearsay cannot be considered on a

11  motion for summary judgment"); *Sobel v. Hertz Corp.*, 291 F.R.D. 525, 533 (D. Nev. 2013)

12  ("Hearsay evidence—an out of court statement offered for the truth of the matter asserted—is

13  inadmissible unless it is defined as non-hearsay or it falls under a hearsay exception.").  Unlike

14  the evidentiary objections to plaintiff's testimony in *Fraser* that could be cured at trial, it is

15  impossible for LT Game International to cure the evidentiary problems contained in the proffered

16  Feng and Chun testimony.

17      For the same reasons, Feng's sham Declaration is inadmissible to establish SHFL's alleged

18  misrepresentations to third parties.[4]  In addition to the obvious hearsay defects, Federal Rule of

19  Civil Procedure 56(c)(4) "requires that supporting and opposing affidavits be made on personal

20  knowledge of the affiant, set forth facts that would be admissible in evidence, and show

21  affirmatively that the affiant is competent to testify to the matters stated therein."  *Scharf v. U.S.*

22  *Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979); Fed. R. Civ. P. 56(c)(4) (a declaration made to

23  oppose summary judgment "must be made on personal knowledge"); *Rebel Oil Co., Inc. v.*

24  *Atlantic Richfield Co.*, 957 F.Supp. 1184, 1193 (D. Nev. 1997) (citing *British Airways Bd. V.*

25

26

---

27  [4]     Pursuant to Federal Rule of Civil Procedure 56(c)(2), and for the reasons stated herein, SHFL
hereby objects to and moves to strike all portions of Feng's declaration that constitute hearsay and that are

28  not based on his own personal knowledge.  SHFL's specific objections to LT Game International's other
inadmissible evidence are set forth in the objection filed contemporaneously with this Reply.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

*Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("Affidavits that do not affirmatively demonstrate personal knowledge" are insufficient to avoid entry of summary judgment.)

Feng admits that he "personally ha[s] never witnessed anyone from Shuffle Master saying anything disparaging about LT Game International or any of its products that it markets." (Ex. G to Mot., Feng Dep., Vol. I, 137:2-138:2 ("No, I don't hear directly for myself.").) Nevertheless, LT Game International claims that Feng's statements about what others heard should preclude summary judgment. However, Feng lacks the competence and personal knowledge required under Rule 56(c)(4) to provide testimony through a declaration as to what SHFL purportedly said to non-parties to this litigation. *Id.*; *see also Hill v. The Boeing Co.*, 765 F. Supp. 2d 1208, 1212 (C.D. Cal. 2011) ("'[p]ersonal knowledge' means knowledge of a fact perceived by the senses, by one who has had an opportunity to observe, and must have actually observed the fact."). If LT Game International believed that evidence of such statements existed, it was its burden to obtain it and presented in response to SHFL's Motion. *Rebel Oil Co.*, 957 F.2d at 952 (the party opposing entry of summary judgment has the burden of presenting "significant probative evidence tending to support [its] legal theory.")

In any situation, Feng's and Chun's testimony about alleged third-party communications – whether in the form of deposition testimony or a declaration – is inadmissible for all purposes either at the summary judgment stage as well as at trial. *Romero*, CV-808-JAD-VCF, 2013 WL 6206705 at *3; *Orr*, 285 F.3d at 773-74. And, because that is the only "evidence" LT Game International provides to support its allegations that SHFL made misrepresentations to its potential customers, the result is that LT Game International has no admissible evidence to support any of its claims.[5]

---

[5] LT Game International's reference to an e-mail from Isaacs to a member of the Association of Gaming Equipment Manufacturers is a red herring. Setting aside the fact that the e-mail simply expresses Isaacs' opinion of the impropriety of non-party LT Game's tactics, it in no way constitutes a misrepresentation or any representation to a potential customer.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

**B.     SHFL Is Entitled To Summary Judgment On LT Game International's Claims As A Matter Of Law.**

Given that LT Game International has no admissible evidence that SHFL ever made any misrepresentations to its potential customers, the only question left for this Court to answer is whether SHFL's alleged statements concerning a non-party at G2E Asia 2012 are actionable as unfair competition or intentional interference as a matter of law. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982) ("[S]ummary judgment is appropriate where the record before the court on the motion reveals the absence of any material issue of fact and where the moving party is entitled to judgment as a matter of law."). They are not.

*1.     There Is No Evidence To Support LT Game International's Allegations Of Unfair Competition.*

While the claims for "unfair competition" can be based on various types of commercial activity, LT Game International's First Amended Complaint is based entirely on purported "misrepresentations." (*See* Dkt. #14, Am. Compl. ¶ 13.) Generally speaking, unfair competition requires a "false or misleading representation of fact" which "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. 15 U.S.C. § 1125 (a)(1)(B) (§ 43(a)).[6] Likewise under Macau law, one example of unfair competition is defined as "[t]he making or broadcast of statements on the enterprise, products, services or commercial relations of competitors, which are apt to diminish their credit in the market, is considered unfair except if they are exact, true and pertinent." Macau Com. Code, Chap. II, Art. 162.

LT Game International initially alleged that SHFL unfairly competed at G2E Asia 2012 by making "misrepresentations regarding Plaintiff's business and products . . . directly and indirectly to Plaintiff's current and prospective customers in the gaming and casino industry." (Dkt. #14,

---

[6]     LT Game International's criticism of SHFL's reliance on unfair competition cases in the context of trademark infringement is puzzling. LT Game International's primary claim for relief is brought under Section 43 of Lanham Act, which constitutes the federal regulation governing trademarks and is referred to at times in the common vernacular as the "Trademark Act."

1  Am. Compl. ¶ 13.) Of course, there was absolutely no evidence of that. And so LT Game

2  International sought to amend its theory[7] to expand upon its allegations by claiming that SHFL

3  unfairly competed at G2E Asia 2012 by "us[ing] undue influence and ma[king] false

4  representations" to have the show's co-organizers, the American Gaming Association (the "AGA")

5  and Reed Exhibitions ("Reed"), interfere with LT Game's booth after it had portions of SHFL's

6  booth obstructed based on unsubstantiated claims of patent infringement. (Dkt. #94, Opp'n, 4:15-

7  16; *id.*, 12:22-23.)

8  Once again, LT Game International's allegation is not supported by the evidence. Recall,

9  just before the start of the G2E Asia 2012, Chun and another one of his companies (again, a non-

10  party to this case) obtained an *ex parte* decision from a Macau court allegedly enjoining one of

11  SHFL's subsidiaries (in fact, an entity that does not even exist) from showing its products at the

12  show. (Ex. A to Mot., Chun Dep., 53:7-9 (

13  ; Ex. B to Mot., SHFL 10-Q dated Sept.

14  6, 2013, 19.) Then, on the first day of the show, representatives of LT Game escorted Macau

15  customs officials to SHFL Asia's booth, where Macau customs officials' requested that SHFL's

16  subsidiary cover certain of its games. (*Id.*; Ex. Q to Mot., Fahrenkopf Dep., 29:13-30:4; *id.*, 62:5-

17  12.) Notably, LT Game is not a party to this action nor was LT Game International involved in

18  those Macau proceedings.

19  In response, SHFL's former CEO, Gavin Isaacs, told Reed that he believed LT Game's

20  actions were "unacceptable," and that in his opinion "it [did] not make sense [for SHFL] to spend

21  nearly half a million dollars on a trade show and not be able to show [its] product." (Ex. 1, Isaacs

22  Dep., 71:5-8.) Reed then told Isaacs: "Don't worry. We'll sort this out." (*Id.*, 73:5-9.) Notably,

23  the show's organizers' "first words" to Isaacs were: "If you can't show your product, they can't

24  show theirs." (*Id.*, 72:6-9.)

25

26

---

27  [7]   This theory was set forth for the first time in LT Game International's Second Amended Complaint.
SHFL timely opposed the request and this Court has not granted LT Game International leave to file the
28  amended pleading.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

When asked, Isaacs testified that he "d[id] not recall" ever requesting that Reed ask LT Game "to withdraw the enforcement of their injunction" or leave the show, and did not believe he would have done so because he "had no authority to demand or tell them that." (*Id.*, 73:10-74:24; Ex. 2, Knowles Dep., 171:15-173:3.)   However, after LT Game International's redundant questioning and misleading characterization of another witness's prior testimony, Isaacs reiterated that he did not remember requesting that the show's organizers take any action but that it was "possible" that he may have said something to that effect. (Ex. 1, Isaacs Dep., 73:21-74:24.)[8]

Assuming, for purposes of this Motion only, that Isaacs did ask G2E Asia organizers to ask LT Game, a non-party to this action, to withdraw its injunction or to leave the show, there is still *no* evidence that Isaacs "used undue influence and made false representations" to those show organizers, as LT Game International maintains.  Nor has LT Game International produced any evidence that Isaacs made a false "representation of fact or statement" about the enterprise, products, or services of LT Game International, as required to support a claim for unfair competition.   Instead, the only evidence is that Isaacs simply stated the obvious: that patent disputes should be revolved in court, not on the floor of a gaming show.

LT Game International is effectively seeking to hold SHFL responsible for the independent actions of the G2E Asia show organizers relating to a non-party to this action. But again, LT Game International has not presented any evidence whatsoever that SHFL directed, or had any authority to direct, or was in any way involved in Reed's and/or AGA's actions relating to non-party LT Game's booth at the show.  By all accounts (and all evidence in this case), the decision came from the show organizers themselves. As the President of the AGA explained, they believed "it was very unfair that LT [Game] was trying to disrupt the show by preventing

---

[8]     LT Game International's tortured interpretation and manipulation of the testimony of SHFL's representatives renders it unrecognizable from their actual testimony.  For the sake of clarity, SHFL's general manager of electronic table systems, Brandon Knowles, testified that SHFL was "aware of a stance being taken by Reed Exhibitions" that if LT Game did not withdraw its injunction and let the show proceed, LT Game may have been asked to leave the show. (Ex. 2, Knowles Dep. 169:24-170:11.) He also testified that he believed Isaacs may have asked Reed to ask LT Game to not enforce its injunction at the show or be removed from the show. (*Id.*, 171:15-20.)    There were no "ultimatums" or "demands" made by any SHFL representatives, and certainly no "admissions" of misrepresentations.  LT Game International's characterizations of Knowles' and Isaacs' testimony is unsupported by the record.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Shuffle Master from showing their product," and that LT Game was improperly using the show to obtain "leverage" in the parties' longstanding patent dispute.  (Ex. Q to Mot., Fahrenkopf Dep., 37:16-18, 63:6-16.)  As such, show organizers met with representatives of LT Game and told them: "[I]f Shuffle Master was going to be forced to leave the show, that we were going to exercise the rights under the contract between LT Games [sic] and Reed, that they would be asked to leave the show."  (*Id.*, 52:13-17.)  Any further actions taken relating to LT Game's booth were also made by "a representative of Reed[,]" not SHFL.  (*Id.*, 53:14-20.)

Importantly, there is no testimony or evidence that SHFL directed or was in any way involved in that decision.  In fact, SHFL did not even know that any actions were taken in regard to LT Game's booth until the following day when they learned that "somebody barricaded the LT booth with some fences of some kind."  (Ex. 2, Knowles Dep. 170:13-171:5.)  To this day, SHFL is unaware of who put up those fences, although it "assumes" it was Reed because "[i]t was their show."  (*Id.*, 170:19-171:5.)

Seemingly recognizing these facts do not meet the elements of unfair competition under the Lanham Act and Macau Commercial Code, LT Game International urges this Court to adopt an "extremely flexible" definition of unfair competition under Nevada's common law.  (Dkt. #94, Opp'n, 9:24.)  It claims that unfair competition under Nevada's common law should include anything that meets "changing conceptions of what is wrong."  (*Id.*, 10:10-11.)

Even if this Court were inclined to adopt such a broad, amorphous view, LT Game International has still not presented any evidence to support a conclusion that SHFL engaged in unfair competition.  The undisputed evidence establishes that G2E Asia show organizers made decisions related to LT Game's booth, not SHFL.  (Ex. Q to Mot., Fahrenkopf Dep., 53:14-20.)  Thus, the only evidence of SHFL's alleged unfair competition is the fact that Isaacs *may* have asked Reed to ask LT Game "to withdraw the enforcement of their injunction" or leave the show, although he does not recall doing so.  (Ex. 2, Knowles Dep., 171:15-173:3; Ex. 1, Isaacs Dep., 73:10-74:24.)  Such a request, however, if made, cannot constitute unfair competition as a matter of law as it does not constitute a false statement of fact.  *Rainbow Play Sys., Inc. v. GroundScape Technologies, LLC.*, 364 F. Supp. 2d 1026, 1032 (D. Minn. 2005) (recognizing that, like a claim

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1  for false advertising or unfair competition under the Lanham Act, an unfair competition claim

2  under the common law requires, inter alia, a showing of "false statements of *fact*.") (emphasis

3  added)).

4      Ultimately, there is no evidence (admissible or otherwise) to support LT Game

5  International's allegation that Isaacs or anyone else at SHFL "used undue influence and made false

6  representations" to get G2E Asia show organizers to take actions relating to LT Game's booth.

7  Isaacs' request that the show's organizers speak to LT Game because he believed its actions were

8  unfair, if made, does not constitute unfair competition as a matter of law.[9]  Summary judgment is

9  appropriate as to all three of LT Game International's unfair competition claims.

10      **2.    *LT Game International Similarly Lacks Evidence To Support Its Claim For Intentional Interference With Contractual Relations.***

11

12      LT Game International similarly lacks evidence to support its claim for intentional

13  interference with contractual relations.  As LT Game International recognizes in its Opposition,

14  the elements for a claim of wrongful interference with a prospective economic advantage under

15  Nevada law are: "(1) a prospective contractual relationship between the plaintiff and a third party;

16  (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff

17  by preventing the relationship; (4) the absence of a privilege or justification by the defendant; and,

18  (5) actual harm to the plaintiff as a result of the defendant's conduct."  *Hutchison v. KFC Corp.*,

19  809 F. Supp. 68, 72 (D. Nev. 1992).  "[A] plaintiff must show that the means used to divert the

20  prospective advantage was unlawful, improper or was not fair and reasonable."  *Custom*

21  *Teleconnect, Inc. v. Int'l Tele-Servs., Inc.*, 254 F. Supp. 2d 1173, 1181 (D. Nev. 2003).

22          i.    There Is No Evidence Of Interference.

23      To begin, and as explained above, there is no evidence that anyone at SHFL made

24  "misrepresentations regarding Plaintiff's business and products . . . directly and indirectly to

25

26  [9]    Likewise, LT Game International's claim that it was somehow damaged by the activity that took place during G2E Asia 2012 or in any way prevented from entering into contracts as a result of those events

27  is belied by the evidence. Purportedly, one of LT Game International's affiliates, LT Game International (U.S.) Ltd. has apparently secured a deal with the Las Vegas Sands, an entity that was unquestionably present at G2E Asia 2012 as the show was held at its Macau property, subsequent to that gaming show.

28  (Dkt. #94, Opp'n, 4:5-9.)

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1  Plaintiff's current and prospective customers in the gaming and casino industry." (*See* Dkt. #14,

2  Am. Compl. ¶ 13.) And there is no evidence that anyone at SHFL "used undue influence and

3  made false representations" to have the AGA and Reed shut down LT Game's booth at G2E Asia

4  2012. (*See*; Dkt. #94, Opp'n, 4:15-16; *id.*, 12:22-23.)  The only evidence in this case is that, after

5  LT Game obtained an *ex parte* injunction against a non-existent entity SHFL entity and interfered

6  with SHFL's subsidiary's presentation at the show, Isaacs told Reed that LT Game's actions were

7  "unacceptable," and that "it [did] not make sense [for SHFL] to spend nearly half a million dollars

8  on a trade show and not be able to show [its] product." (Ex. 1, Isaacs Dep., 71:5-8.)  Then, after

9  Reed told Isaacs "Don't worry.  We'll sort this out." and that "If you can't show your product, they

10  can't show theirs.", (*id.*, 72:6-9, 73:5-9), Isaacs may have asked Reed to ask LT Game to either

11  "withdraw the enforcement of their injunction" or leave the show, although he does not recall

12  doing so  (*id.*, 73:10-74:24; Ex. 2, Knowles Dep., 171:15-173:3.)   None of these statements

13  constitutes evidence of "interference" with prospective business relationships.

ii.     There Is No Evidence That SHFL Knew of Any "Prospective
       Contractual Relations.

16  With this in mind, LT Game International has presented no evidence that SHFL knew

17  about any prospective relationships that LT Game International may have had when any of the

18  alleged unfair conduct purportedly took place, as required for a claim for intentional interference.

19  *See Nat'l Right To Life Political Action Comm. v. Friends of Bryan*, 741 F. Supp. 807, 813 (D.

20  Nev. 1990) ("Interference with contractual relations is an intentional tort which requires that the

21  Defendant know of the existence of the contract with which it interferes or, at least, of facts from

22  which the existence of the contract can reasonably be inferred.").  The only "evidence" LT Game

23  International offers to establish SHFL's knowledge is Feng's hearsay-ridden testimony about

24  SHFL's meeting with potential customers.  However, even if this Court were to consider that

25  inadmissible evidence about the alleged meetings, the meetings occurred *after* G2E Asia 2012,

26  which is when Isaacs spoke to Reed about LT Game's injunction that serves as the sole remaining

27  basis of LT Game International's claims (although LT Game International was not even the party

28

1   displaying products at the show).  As such, there is no evidence that SHFL knew about LT Game

2   International's prospective business relations.

3                    iii.        There Is No Evidence Of Intent.

4        Moreover, LT Game International also lacks evidence of Isaacs' intent to interfere with LT

5   Game International's prospective contractual relations.  There is no evidence that SHFL intended

6   to take any actions designed to prevent LT Game International from entering into contracts with

7   some unknown third parties, as required under the law.  *Hutchison*, 809 F. Supp. at 72.  Similarly,

8   LT Game International has not presented any evidence that SHFL knew that any conversations

9   with G2E Asia show organizers could possibly disrupt its contractual relations.  Indeed, the

10  evidence shows that show organizers were already planning to speak with LT Game and handle

11  the situation as it deemed necessary even prior to speaking with Isaacs.  (Ex. 1, Isaacs Dep., 72:6-

12  9, 73:5-9.)  This lack of evidence, in and of itself, precludes a claim for intentional interference

13  with contractual relations.  *Nat'l Right To Life Political Action Comm.*, 741 F. Supp. at 814 ("The

14  fact of a general intent to interfere, under a definition that includes imputed knowledge of

15  consequences, does not alone suffice to impose liability.").

16       Grasping at straws, LT Game International alternatively claims that the Court can find

17  "intent" of harm by SHFL's purported conversations with one potential customer, Michael

18  Patterson ("Patterson") of Barona Casino, regarding this action.  Again based on Feng's hearsay

19  testimony, LT Game International claims that SHFL "falsely inform[ed]" Patterson that he was a

20  potential witness in this case.  (Dkt. #94, Opp'n, 18:5-19.)  Of course, such a statement is in no

21  way false as LT Game International has expressly identified Mr. Patterson and other potential

22  customers as individuals who are "likely to have knowledge of discoverable information ***that***

23  ***plaintiff may use to support their [sic] its claims or defenses***" in its Rule 26 disclosures.  (Ex. 3,

24  LT Game International's Initial Discl.) (emphasis added).  LT Game International's attempt to

25  manufacture a purported false representation or SHFL's "intent" to interfere with its relationships

26  is wholly misplaced.

27       Ultimately, LT Game International only has non-party LT Game to blame if it believes its

28  relationships with prospective customers were damaged on account of what happened at G2E

1   Asia 2012. That is to say, had LT Game not tried to use the show in what its organizers believed

2   was an "unfair" attempt to get leverage against SHFL, no dispute would have arisen at the

3   conference, which LT Game International admits is the source of its alleged damages in this case.

4   (Dkt. #94, Opp'n, 12:20-21 ("LT Game's important customers, including Genting Group,

5   witnesses LT Game's fenced off booth."); *id.*, 13:17-19 (claiming that "the LT Game brand was

6   damaged on account of this controversy").)  Under no scenario, however, is SHFL liable for those

7   purported and speculative damages.

8            Just like with the unfair competition claims, there is no evidence that SHFL did anything

9   to "intentionally interfere" with LT Game International's prospective business relations, to the

10  extent any existed. Following, SHFL is entitled to summary judgment on this claim as well.

> ### 3.      *LT Game International's Experts Do Not Create A Genuine Issue Of Material Fact.*

13           In a last ditch effort to create the appearance of a genuine issue of material fact, LT Game

14  International cites to the reports and testimony of its two damages experts as purported evidence

15  that SHFL is liable for unfair competition and intentional interference with contractual relations.

16  LT Game International's reliance on its expert reports is misplaced.   "[A] party may not avoid

17  summary judgment solely on the basis of an expert's opinion that fails to provide specific facts

18  from the record to support its conclusory allegations." *Evers v. General Motors*, 770 F.2d 984,

19  986 (11th Cir. 1985).

20           Notably, both of LT Game International's experts admit that they "assumed for purposes of

21  [their] analysis that [SHFL] will be found liable for the alleged wrongful conduct," and did not

22  otherwise conduct their own investigation as to what, if anything, SHFL did to purportedly

23  unfairly compete or interfere or reach any conclusions that SHFL in fact did.[10]  Based upon these

24  assumptions of liability, the experts simply opined that LT Game International could have

25  [10]      Dkt. #91, Meister Decl., Ex. 1, p. 2 (

26                                          Dkt. #92, Giuffre Decl., Ex. 1, p. 3 (

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1    suffered damages *if* those allegations were subsequently proven.  (Dkt. #91, Meister Decl., Ex. 1,

2    2; Dkt. #92, Giuffre Decl., Ex. 1, 3.)   Of course, LT Game International has not presented

3    admissible evidence to support *any* of its allegations.   As such, LT Game International cannot use

4    its experts' regurgitation and assumption of alleged facts and conclusory opinions as to liability as

5    purported evidence to avoid summary judgment.  *See In re Trasylol Prods. Liability Litigation*,

6    709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (refusing to consider proffered expert that merely

7    "regurgitates" facts and then reaches conclusory opinions assumes the role of advocate and

8    invades the province of the trier of fact).

9    **C.**    **LT Game International Lacks Standing To Maintain The Present Action.**

10    Not only does LT Game International lack admissible evidence to support its claims, it

11    lacks constitutional and prudential standing to maintain them in this action.

12          *1.*    ***LT Game International Has Not Suffered An "Injury In Fact."***

13    To begin with, LT Game International has presented no evidence that it has suffered a

14    non-speculative "injury in fact," as required to confer Article III standing.  *See Henry v. Circus*

15    *Circus Casinos, Inc.*, 223 F.R.D. 541, 543 (D. Nev. 2004) (quoting *Friends of the Earth, Inc. v.*

16    *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).  LT Game International claims

17    that but for SHFL's actions, it would have entered into contracts with customers in the gaming

18    industry.  However, that claim is belied by the evidence as it was never going to enter into any

19    agreements with customers nor could it do so as a matter of law.

20    LT Game International's utter disregard for regulatory requirements is as erroneous as it is

21    offensive.  While LT Game International could potentially discuss possible deals with prospective

22    customers prior to licensure, it was impossible and ***illegal*** for LT Game International ***to enter*** into

23    any agreements before obtaining regulatory approvals and/or licenses in any jurisdiction.   *See*

24    NRS 80.010(1) ("Before commencing or doing any business in this State, each corporation

25    organized pursuant to the laws of …a foreign country that enters this State to do business" is

26    required to register with the Nevada Secretary of State and file certain corporate documents); NRS

27    463.650 ("[I]t is unlawful for any person . . . to operate, carry on, conduct or maintain any form of

28    manufacture, selling or distribution of any gaming device . . . without first procuring and

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800.
LAS VEGAS, NEVADA 89169

maintaining all required federal, state, county and municipal licenses."); NGC Reg. 14.260 ("[A] manufacturer or distributor of associated equipment shall not distribute associated equipment unless it has been approved by the chairman."). Therefore, prior to obtaining regulatory approvals for its products, it would have been impossible to enter into any agreements with any parties in the State of Nevada.

Further, there is absolutely no evidence that LT Game International would have entered into these various agreements with third parties but for SHFL's purported statements to G2E Asia organizers, which is the only conduct at issue. In fact, there is not even any evidence that any third parties knew about any conversations between show organizers and SHFL at G2E Asia. Instead, there is only Feng's rank speculation that SHFL made "misrepresentations" or used "undue influence" to get show organizers to take action related to LT Game's booth (which it did not) and further speculation that those actions caused third parties to halt dealings with LT Game International. Regardless, the evidence demonstrates that LT Game International, the sole plaintiff in this action, was not going to be the recipient of any contract in any event. (Dkt. #80, Ex. C to Mot., Feng Dep., Vol. II, 22:7-12.) In short, more, much more is required for LT Game International to demonstrate n "injury in fact" to afford it constitutional standing to maintain the instant action.

### 2. *LT Game International Similarly Lacks Prudential Standing.*

LT Game International's standing shortcomings do not end there. It also lacks prudential standing. Despite the legal conclusions put forth in Feng's unsubstantiated Declaration, LT Game International is not "only raising claims on behalf of itself with respect to damages it itself sustained on account of SHFL's actions." (Dkt. #94, Opp'n, 25:27-26:1.) Even under its own version of the facts, LT Game International bases its claims on SHFL's purported statements to G2E Asia organizers concerning *LT Game's* "unacceptable" and unfair attempt to gain leverage in the patent dispute between *LT Game* and SHFL and its subsidiaries. As such, any alleged harm to LT Game International (the sole Plaintiff in this action) are derived through its relationship with its licensor, LT Game.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1    In this way, and as explained in the Motion, LT Game International is no different from

2  any of the other numerous entities that market or sell LT Game's products or services. Under LT

3  Game International's theory, each and every entity would have independent standing to assert

4  "claims on behalf of itself" and seek damages based upon its status as an LT Game licensee,

5  wherever that may be on the licensee food chain.[11]  This same theory was expressly rejected by

6  the Third Circuit in *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir.

7  1998). *See also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 118 (2d Cir. 2010)

8  (noting that "[t]he risk of duplicative damages or complexity is apportioning damages" as a factor

9  for prudential standing).

10    Ultimately, to the extent an actual – as opposed to conjectural – injury in fact was

11  sustained, it was sustained by LT Game.  LT Game International and all of the other LT Game

12  affiliates and licensees do not have standing to maintain frivolous and redundant actions on behalf

13  of LT Game.  While LT Game's claims would equally fail for the lack of evidence set forth herein,

14  these standing concerns are additional reasons why this Court should enter summary judgment

15  against all of LT Game International's claims for relief.

## III.    CONCLUSION

17    LT Game International can no longer rest upon the mere allegations in its Complaint to

18  maintain this lawsuit.  The law requires that a nonmoving party set forth admissible evidence to

19  avoid summary judgment.  And, after almost two years of perpetrating its "fishing expedition"

20  discovery, there is still no evidence that SHFL did anything to unfairly compete or interfere with

21  LT Game International's business relations.   There is also no evidence that LT Game

22  International's business suffered in any way from anything that SHFL did.

---

[11]    Oddly, LT Game International claims that, "unlike LT Game International, [its business partner] LT Game International US was not injured by SHFL's actions." (Dkt. #94, Opp'n, 25:7-8.) Simply put, this makes no sense.  If SHFL unfairly competed or interfered with LT Game International's contracts, as alleged, LT Game International US, which receives certain profits made from selling LT Game's products in the United States, would have suffered damages as well.  This is the point of prudential standing.  LT Game is not permitted to create another plaintiff by licensing its products to a new entity.

1        For these, and all of the reasons set forth in the Motion, SHFL respectfully requests that

2  this Court enter summary judgment against each and all of LT Game International's claims.

3        DATED this 6th day of January, 2014.

4                      PISANELLI BICE PLLC

6                      By: _____

7                      James J. Pisanelli, Esq., Bar No. 4027
                        Christopher R. Miltenberger, Bar No. 10153

8                      Eric T. Aldrian, Esq., Bar No. 11897
                      3883 Howard Hughes Parkway, Suite 800

9                      Las Vegas, Nevada  89169

10                    *Attorneys for SHFL entertainment, Inc.*
                      *f/k/a Shuffle Master, Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the _6_ day of January, 2014, I electronically filed the foregoing **REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** using the Court's CM/ECF system which will send notification to the following:

Jacquelyn S. Leleu, Esq
Amanda C. Yen, Esq.
Joseph P. Schrage, Esq.
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102
(702) 873-4100

and

Dariush Kayhani (*pro hac vice*)
MEREDITH & KEYHANI, PLLC
330 Madison Avenue, 6th Floor
New York, New York 10017
(212) 760-0098

Attorneys for Plaintiff LT Game International, Ltd.

An employee of PISANELLI BICE PLLC

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169