DARIUSH KEYHANI (DK9673) (*pro hac vice*)
MEREDITH & KEYHANI, PLLC
330 Madison Avenue, 6th Floor
New York, New York 10017
Telephone:     212.760.0098
Direct Dial:     646.536.5692
Facsimile:      212.202.3819
Email: dkeyhani@meredithkeyhani.com

JACQUELYN S. LELEU, ESQ.
Nevada Bar No. 7675
AMANDA C. YEN, ESQ.
Nevada Bar No. 9726
JOSEPH P. SCHRAGE, ESQ.
Nevada Bar No.  11270
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Ste. 1200
Las Vegas, NV  89102
Telephone:     702.873.4100
Facsimile:      702.873.9966
Email: jleleu@mcdonaldcarano.com
           ayen@mcdonaldcarano.com
           jschrage@mcdonaldcarano.com

*Attorneys for Plaintiff LT Game*
*International Ltd.*

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| LT GAME INTERNATIONAL LTD., | CASE NO.  2:12-cv-01216-JAD-GWF |
| Plaintiff, | |
| v. | **LT GAME INTERNATIONAL LTD.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** |
| SHUFFLE MASTER, INC., | |
| Defendant. | |

## I.      PRELIMINARY STATEMENT

Over the past five years, defendant SHFL Entertainment, Inc. f/k/a Shuffle Master, Inc. ("SHFL") has used every trick in the book to undermine the LT Game Group's sale and distribution of its market-dominating Live Table Multi-Game electronic gaming product/system ("LTMG") and obstruct the introduction of this product into the U.S. Not surprisingly, these

tricks continue to this day, as Defendant's motion is riddled with inaccurate versions of facts and misleading conceptions of the law.

Defendant's version of the facts is simply wrong. Defendant misstates the law, ignores the facts, and tells a tale that is inconsistent with the evidence—this is a case about a company that cannot compete on the merits of its products and instead chooses to cheat.  *See* Plaintiff's Third Amended Complaint (Dkt. 115).[1]  These actions permeate SHFL's entire organization.

The law of unfair competition is flexible and broad and encompasses unfair business practices and cheating in any form – even those not yet imagined.  The depth and scope of this body of law is supported by a rich history of precedent and legal scholarship.  Contrary to Defendant's claim, the Lanham Act provides a cause of action even when false statements are made in person directly to a customer or prospective customer.  Defendant's actions, including bad faith allegations of patent infringement made to Plaintiff's customers and prospective customers and false representations about the ethics and reputation of Plaintiff and its business activities, clearly constitute unfair competition.  As set forth below, Plaintiff has proffered more than ample evidence to support its cause of action under the Lanham Act and other claims in this case.

---

[1]     Contrary to Defendant's claim, the Third Amended Complaint only asserts additional context and details relating to LT Game International's claims against SHFL consistent with the direction of this Court's March 26, 2014 Opinion and Order.  *See* Order (Dkt. 112).  The additional factual detail alleged in the amended pleading is based on information arising out of almost one year of discovery in this case.  For at least nine months, Defendant was well aware that LT Game International was the exclusive licensee of LT Game for the sale and distribution of LTMG outside of Macau, as LT Game International's principal, Frank Feng, testified to this fact at his deposition in July of 2013. *See* Frank Feng Deposition Transcript, Vol. I ("Feng Tr. Vol. I") at 111:13-16, pertinent portions of which are attached hereto as **Exhibit 1**.  Defendant's claim that Plaintiff's allegations in its amended pleading contradict its original pleading is false.  In addition to other unlawful actions perpetrated by Defendant alleged by Plaintiff, Plaintiff has always maintained that Defendant has made false representations regarding Plaintiff, its business activities, and its products, and Plaintiff has obtained substantial evidence to support these claims.

A redacted version and a sealed version of the Third Amended Complaint were filed in this case.  When two versions of a document were so filed, this Opposition will cite to the sealed version.

2

SHFL's international campaign of unfair competition has caused and continues to cause LT Game International, Ltd. ("LT Game International" or "Plaintiff") irreparable harm that warrants a remedy. The time has come for SHFL to compete fairly.

## II.  STATEMENT OF FACTS AND BACKGROUND

### A.  SHFL has been unable to compete with LT Game in the world's largest gaming industry

At \$38 billion in revenue per year, the Macau gaming market is almost five times the size of the Las Vegas strip and larger than the total U.S. casino industry combined. *See* Howard Stutz, *Macau Gaming Revenues Growing in 2012, Hit Record \$38 Billion*, Las Vegas Review Journal, http://www.reviewjournal.com/business/casinos-gaming/macau-gaming-revenues-grow-2012-hit-record-38-billion, attached hereto as **Exhibit 2**.[2]  Though large, the market is a tight knit community, consisting of a small number of buyers that operate gaming properties all around the world. *See* Expert Report of Alan P. Meister ("Meister Report") at 4-6, attached to the Declaration of Alan P. Meister ("Meister Declaration") (Dkt. 98).   As a tight knit community in a highly regulated market, reputation means everything and word travels fast. *Id.*

Both the LT Game Group and SHFL products compete in the Macau market, and both companies have competing products in the market's electronic table systems ("ETS") segment. *See* Brandon Knowles Deposition Transcript ("Knowles Tr.") at 35:5-7, pertinent portions of which are attached hereto as **Exhibit 3**.  LT Game Ltd. ("LT Game"), LT Game International's licensor and business partner (LT Game and LT Game International are collectively referred to herein as "LT Game Group"), first entered the ETS market in 2006 with their LTMG and rapidly became the market leader.  *Id.* at 25:10- 17.  Indeed, LT Game dominates the ETS segment, controlling more than 50% of the market share.  *Id.* at 34:12-23.  With terminals installed at gaming operations all across Macau, LTMG has had great success in the ETS market and enjoys a reputation of being innovative and well liked.  *Id.* at 37:1-10 (describing LT Game as being the first to market a product customers like); *see also* Feng Tr. Vol. I at 159:23-160:2, **Exhibit 1.**

---

[2]    "This court may take judicial notice of adjudicative facts appearing in newspapers." *See Crowder v. Kitagawa*, 81 F.3d 1480, 1492 (9th Cir. 1996).

1   Like the LT Game Group, SHFL also competes in the ETS market. *See* Knowles Tr. at
2   17:5-12, **Exhibit 3**. SHFL's Rapid product line ("Rapid") directly competes with LT Game's
3   LTMG. *Id.* at 22:15-23:17 (describing the Rapid product line as competing with LT Game).
4   Unlike the LT Game Group, however, SHFL has failed to make a dent in the ETS market. *See*
5   *id.* at 35:5-7. Despite efforts to grow in this market, SHFL has only been able to realize less
6   than five percent of the market. *Id.* at 35:5-14 (explaining that SHFL has invested money and
7   resources into marketing and other activities to grow its market share). As LTMG is the most
8   successful product in the market, the LT Game Group has been a serious threat to SHFL. *Id.* at
9   43:9-12.

10   Following its success in the Macau market, LT Game began focusing on expanding to
11   other countries, including the U.S. *Id.* at 48:1-51:8; *see also* Feng Tr. Vol. I at 61:20-62:8,
12   **Exhibit 1**.
13
14
15   Through LT Game International,
16   Feng began marketing and distributing LT Game's LTMG outside of Macau. *See id.* at 57:16-
17   20. As a result, LT Game International has been successful in developing relationships and
18   entering into lucrative prospective deals with industry leaders. *See* Knowles Tr. at 43:21-44:4,
19   **Exhibit 3**
20   Not surprisingly, LTMG has found success in the U.S., including a
21   recent installation
22
23   *See* Exhibits 1-3 attached to the Declaration of Frank Feng ("Feng Decl.") (Dkt. 97).
24   Upon learning LT Game Group was poised to enter the U.S. market, SHFL became
25   concerned. *See* Knowles Tr. at 43:9-12, **Exhibit 3**. News of LT Game Group's expansion plan
26   spread like wildfire. *See id.* at 48:21-49:12. In fear of losing market share to LT Game Group,
27   SHFL took action. But instead of competing with LT Game Group on the merits, by making its
28   product or pricing more competitive, SHFL engaged in an unscrupulous, international campaign

4

of unfair competition. *See* Plaintiff's Third Amended Complaint (Dkt. 115);

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

; Feng. Decl. ¶¶ 8-11 (explaining false statements made to customers); Jay Chun Deposition Transcript ("Chun Tr.") at 51:2-52:17, 70:8-71:25; 62:20-63:5, pertinent portions of which are attached hereto as **Exhibit 5**; Knowles Tr. at 169:24-174:14, **Exhibit 3** (hereinafter collectively "evidence of Defendant's unlawful acts").

### B.    SHFL embarks on an international campaign of unfair competition

Over the past few years, SHFL has systemically been unfairly competing with LT Game Group in gaming markets throughout the world. *See id.* Through the use of threats, disparagement of the LT Game brand and its products, and direct and indirect interference with LT Game International's business contacts and prospective customers, SHFL has succeeded in damaging LT Game International's deals and prospective deals. *See* Meister Report at 6-7; Feng Decl. ¶¶ 8-13, 20-28; A Preliminary Analysis of Economic Damages ("Giuffre Report") attached to the Declaration of Dennis M. Giuffre ("Giuffre Decl.") (Dkt. 99).   SHFL's ambitious early efforts began in 2009 when it attempted to coerce and threaten LT Game President Jay Chun into giving SHFL its valuable patents.  *See* Chun Tr. at 51:2-52:17, 70:8-71:25 (explaining SHFL's patent pool proposals in 2009 and 2012), **Exhibit 5**.  SHFL has twice tried to strong arm LT Game into entering a shared patent pool, where LT Game would put all of its patents and SHFL would put nothing valuable.  *See id.*  Chun was told that if he agreed, SHFL would provide him with protection, and if he refused, SHFL would exhaust LT Game through litigation.  *See id.*  Despite mafia-like offers of protection and threats of litigation, Chun refused to give LT Game's intellectual property to SHFL.  *Id.* at 52:13-17.

### C.    SHFL engages in coercion and unfair competition at the 2012 G2E Asia Tradeshow

After the failed attempt to get direct access to LT Game's patents, SHFL resorted to other tactics, including acts of unfair competition at the 2012 G2E Asia trade show. *Id.* at

55:14- 59:18.  Regarded as one of the premier global gaming events, both LT Game Group and SHFL participated by showcasing their products at the event.  *See* Feng Tr. Vol. I. at 195:6-17, **Exhibit 1**.  Likewise, several gaming executives, including current and potential customers, attended.  *Id.*  Prior to the show, LT Game Group learned that SHFL was planning to display a product believed to infringe LT Game's Macau patents and went to the court to obtain an injunction.  *See* Chun Tr. at 53:1-9, **Exhibit 5**.  Pursuant to a court order, Macau customs officers came to the show and conducted a thorough inspection of SHFL's product.  *See* Knowles Tr. at 151:15-153:12 (explaining that the Macau officers sat at the terminals, asked questions, and examined a product manual), **Exhibit 3**.  As a result of its independent inspection, the Macau Court issued a preliminary injunction and ordered SHLF to refrain from publicly displaying the infringing products.  *See id.* at 158:1-14 (confirming the existence of a court order and stating that the customs officials told SHFL to cover the product); *see also* Declaration of Pedro Cortés ("Cortés Decl.") at ¶ 4 (Dkt. 90).[3]

Angered that it would not be able to display its infringing product, SHFL retaliated.  *See* Chun Tr. at 55:14-59:18, **Exhibit 5**; *see also* Andrew Scott Deposition Transcript ("Scott Tr.") at 19:8-10, pertinent portions of which are attached hereto as **Exhibit 6**.

---

[3]   This was not the only time that SHFL displayed and offered for sale products that infringed LT Game's patents in Macau, they had done this at the 2009 G2E Asia and more recently at the 2013 Macau Gaming Show.  *See* Cortés Decl. at ¶ 3.  Defendant's characterization of SHFL's unlawful actions in Macau and legal proceedings relating to LT Game's claims of patent infringement in Macau are incomplete and inaccurate.  *See id.*, ¶¶ 3-6.  Plaintiff's counsel has been advised by LT Game's Macau counsel that under Macau law the parties are not at liberty to discuss the nature and substance of the Macau prosecutor office's investigations and determinations.

The ultimatum also required LT Game to not enforce its legal rights against potential infringers within two months of every future G2E show.  *See* Chun Tr. at 56:4-12, **Exhibit 5**.  In addition, a metal barrier was placed around the LT Game Group's booth, blocking off all contact with visitors.  *See id.* at 55:14-16; *see also* Scott Tr. at 29:16-21, **Exhibit 6**.

As a result, the LT Game Group was denied access to customers and the right to display its product. *See* Chun Tr. at 55:14-56:3, **Exhibit 5**.  Many customers

To try to mitigate the damage already caused and prevent further harm, LT Game had no choice but to drop the injunction.  *See* Chun Tr. at 60:11-20, **Exhibit 5**.

**D.     The aftermath of the 2012 G2E Asia—the Genting Group deal falls through**

Because of the events at the 2012 G2E Asia, LT Game International lost an imminent deal with the Genting Group.  *See id.* at 62:20-63:5; Feng Decl. at ¶¶ 24-28; Michael Rumbolz Deposition Transcript ("Rumbolz Tr.") at 99:17-103:18, pertinent portions of which are attached hereto as **Exhibit 8**; Meister Report at 5-6.

*See* Chun Tr. at 63:21-25 (discussing unspoken deal to sign a sales contract on the second day of the show), **Exhibit 5**.

*See* Feng Decl. ¶ 26; Feng Tr. Vol. I. at 131:20-132:16, **Exhibit 1**.

1        ███████████████████████████████ Feng Decl., ¶¶ 24, 29; Giuffre Report

2 at 8.

3             **E.**      **SHFL's false representations permeate the gaming community**

4        Even after the 2012 G2E Asia, SHFL continued to make false statements about LT

5 Game Group to members of the gaming community. *See* Feng Decl., ¶¶ at 8-11.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   . . .

**F.      SHFL's international campaign of unfair competition continues**

As recent as February 2014, even after LT Game International filed this lawsuit, SHFL continues to violate and disregard Plaintiff's rights by making false representations about its products and brand to its customers and prospective customers.  *See id.*, ¶ 3; Feng Decl. at ¶¶ 8-11;

SHFL's demonstrated inability to compete with the Plaintiff on the merits of its product has led it to destroy Plaintiff's reputation at every opportunity.  SHFL's continued unlawful attempts to keep the successful LTMG out of the global gaming market have caused Plaintiff irreparable damage.  *See* Meister Report at 6-7. The Court should deny Defendant's motion for summary judgment and motion to dismiss.

**III.      LEGAL ANALYSIS**

**A.      Legal Standard for Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavit shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).  Thus, summary judgment is inappropriate when there is a genuine issue of material fact. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The moving party has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Additionally, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986); *Marvik v. Neighbors*, No. 3:11–CV–00655–LRH–WGC, 2013 WL 6008201, at *2 (D. Nev. Nov. 12 2013).  The nonmoving party is

entitled to all justifiable inferences in its favor and "at the summary judgment stage the judge's function is not himself to weigh evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *See Liberty Lobby, Inc*., 477 U.S. at 249 ([C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge"); *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009). "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case*." Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997).

**B.      SHFL's actions constitute unfair competition under the federal Lanham Act**

Plaintiff has provided more than ample evidence to establish its Lanham Act claim. Section 43(a) of the Lanham Act provides protection against a "myriad of deceptive commercial practices," including false advertising or promotion. *Resource Developers v. Statue of Liberty–Ellis Island Found.*, 926 F.2d 134, 139 (2d Cir.1991). Moreover, this section "has been characterized as a remedial statute that should be broadly construed." *See Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996). The elements of a false advertising claim under section 43(a) are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farm*s, 108 F.3d at 1139.

**1.      SHFL's bad faith false allegations of patent infringement to Plaintiff's customers is actionable under the Lanham Act**

Bad faith claims of patent infringement are actionable under the Lanham Act. *See e.g*., *Fisher Tool Co., Inc. v. Gillet Outillage*, 530 F.3d 1063, 1068 (9th Cir. 2008); *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F.Supp.2d 1118, 1126 (D. Ariz. 2008); *Cummins- Allison Corp. v. Glory, Ltd*., No. 02 C 7008, 2003 WL 22169756, at *2 (N.D. Ill. Sept. 18, 2003)

1  ("Allegations that a party falsely represented to a business's customers that the business was

2  infringing on the party's patent rights will support claims for unfair competition under the

3  common law and the Lanham Act"); *Minebea Co., Ltd. v. Papst*, 13 F. Supp.2d 35, 44 (D.D.C.

4  1998); *Laser Diode Array, Inc. v. Paradigm Lasers, Inc*., F. Supp. 90, 95 (W.D.N.Y. 1997).

5

6

7

8

9

10

11

12

13

14

15

16

17

18  Feng Tr. Vol. I at 139:25-140:6, 147:15-148:3, **Exhibit 1**; Feng

19  Decl. at ¶¶ 8-9.  Defendant's representations that LTMG infringes its U.S. patent were false and

20  made in bad faith.  Defendant has not identified and Plaintiff is not aware of any patents or

21  patent claims that cover LTMG and its technology.  Similarly, research conducted by LT Game

22  Group's patent counsel has not revealed any patents or patent claims that disclose and/or claim

23  LTMG.  *See* Meredith Decl., ¶¶ 4-6, attached hereto as **Exhibit 9**.  Further, Plaintiff in no

24  uncertain terms has admitted it has offered for sale and consummated sales of LTMG in the

25  U.S., and Defendant has not asserted any claim of patent infringement in this case, despite

26  having ample opportunity to do so. *See* Feng Decl. at ¶¶ 19-22.

27  Defendant's false and baseless statements deceived Plaintiff's customers and as a result

28  Plaintiff's deals with these customers have been compromised or lost. *See* Harris Decl. at

11

, **Exhibit 7**; Feng Decl., ¶¶ 8-13 (█████████████████████████████

███████████████████████████; Feng Tr. Vol. I 139:25-140:6, 147:15-148:3, **Exhibit 1**

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ Feng Decl. at ¶¶ 12-15; Feng Tr. Vol. I at 87:5- 88:25, **Exhibit 1**.

Under this arrangement, ██████████████████████████████████████████

████████████████████████ *See* Feng Tr. Vol. I at 90:18-21, **Exhibit 1**.

    In addition to false allegations of patent infringement, ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *See* Feng

Decl., ¶¶ 10-11.  Like SHFL's baseless patent infringement allegations, the statement that the

LT Game Group cannot sell its products, including LTMG, outside of Macau is false.  There are

no legal or regulatory restrictions or prohibitions against Plaintiff selling LTMG outside of

Macau and LTMG has and continues to be sold and installed outside of Macau, █████████████

███████████████████████████████████████████ *See* Frank Feng

Deposition Transcript Vol. II. ("Feng Tr. Vol. II.") at, 125:6-126:12, attached hereto as **Exhibit**

**10**; Feng Decl. at ¶ 30.

████████████████████████████████████████████████████████████████

██████████████████████████████████ *See* Feng Tr. Vol. I. 121:11-122:16

(expressing surprise and anger upon learning SHFL's statements were false), **Exhibit 1**

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *See id.* at

121:11-122:16. In the case of Genting Group Resort World Manila, SHFL itself made a deal

with the resort for the installation of ninety (90) of its own competing electronic gaming

products while making false statements about Plaintiff's LTMG. *See* Feng Decl. at ¶ 11.

████████████████████████████████████████████████████████████████

██████████████ *See id.* at ¶¶ 10-11.

Indeed, several customers contacted Mr. Feng to express concern—believing something was wrong with LT Game Group's products and business activities. *See* Feng Tr. Vol. I. 131:5-132:3

**Exhibit 7**; Scott Tr. at 41:16-19, 42:14-16, **Exhibit 6**; Meister Report at 5-6; Rumbolz Tr. at 99:17-103:18, **Exhibit 8**.

> **2.    Because the gaming industry is small and interconnected, SHFL's statements satisfy the Lanham Act's "commercial advertising or promotion" element**

Defendant's argument that its representations do not qualify as having taken place in a "commercial advertising or promotion" is untenable.   Contrary to Defendant's claim, advertising and promotion extends beyond traditional advertising campaigns. *See Gonzalez v. Allstate Ins. Co.*, CV 04-1548FMCPJWX, 2005 WL 5891935, *6-7 (C.D. Cal. Aug. 2, 2005) (distinguishing advertising from promotion and explaining that "promotion, as it is to be understood in the Lanham Act, is different from the traditional understanding of *advertising* as "widespread promotional activities usually directed to the public at large."); *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995). Further, determining whether a communication is considered "advertising or promotion" is fact specific and turns on the nature of the industry. *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999); *Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1385 (5th. Cir. 1996).  Therefore, rather than focusing on widespread, impersonal activity, the inquiry focuses on the "relevant industry" and whether the communication was sufficiently disseminated in that context. *Gonzalez*, 2005 WL 5891935, *7-8.  Defining the relevant purchasing public is a question of fact. *See Coastal Abstract,* 173 F.3d at 735.

When an industry is small and closely connected, ***even direct communication with one individual purchaser can satisfy this element.*** *See id.* at 735; *Gonzalez*, 2005 WL 5891935, *7-8 (C.D. Cal. Aug. 2, 2005).  For example, in *Coastal Abstract Service*, the plaintiff hired the defendant to help it provide services for a third party mortgage company, Shearson. *Coastal Abstract Service, Inc.,* 173 F.3d at 729-30.  During this engagement, representatives from the defendant met with representatives from Shearson and made disparaging remarks regarding the plaintiff. *Id.*  The defendant offered to provide all of the services to Shearson that the plaintiff had been providing. *Id.*  The court considered whether the statements, made only to Shearson, were "sufficiently disseminated to the relevant purchasing public to constitute ... ***'promotion' within that industry.''*** *Id.* at 735.  The court concluded that even though the statements had been made directly to only one potential customer, based on the size of the industry, the activity constituted sufficient dissemina*tion. Id.*

As in *Coastal Abstract Service*, the gaming industry is small and interconnected, consisting of a small number of buyers that operate gaming properties throughout the world. *See* Meister Report at 4-6, Feng Tr. Vol. I. 93:20-94:1, **Exhibit1**.  Further, word of mouth promotion, rather than traditional advertising campaigns, is widely used. *See* Meister Report at 5 ("[t]he gaming industry consists of a relatively small community of gaming operators, suppliers, and regulators"); Feng Tr. Vol. I. 93:20-94:1 ("...gaming industry is very small...word[] travels very fast..."), **Exhibit 1**.[4]  Given the small size of the gaming industry, SHFL's conduct satisfies the Lanham Act's "advertising or promotion" requirement. Defendant's false statements were made for the purpose of promoting SHFL and its products by destroying the credibility and reputation of the LT Game Group and its products and placing fear of liability for patent infringement in the Plaintiff's customers and potential customers based on false allegations of patent rights and infringement of those rights. *See e.g., Harris*

---

[4]     It is well settled in this Circuit that where the nonmoving party's qualified expert disputes a material fact in the case, summary judgment is inappropriate.  *See Southland Sod Farms*, 108 F.3d at 1144; *Sieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980). Here, Plaintiff's gaming industry expert, Alan P. Meister, opines that the gaming industry is very small and word of mouth travels very fast and other than Defendant's counsel's argument Defendant presents no evidence to the contrary. *See* Defendant's Motion to Dismiss (Dkt. 119) at 20:8-10.

1    ███████████. Accordingly, SHFL's false statements constitute false advertising

2    under section 43(a) of the Lanham Act.

3        **C.    SHFL's actions constitute unfair competition under Nevada common law
                 and Macau law.**

4

5        Under Nevada law, the tort of unfair competition is "extremely flexible, and courts are

6    given wide discretion to determine whether conduct is 'unfair.'" *Golden Nugget, Inc. v.*

7    *American Stock Exchange, Inc.*, 828 F.2d 586, 591 (9th Cir. 1987); *Custom Teleconnect, Inc. v.*

8    *International Tele-Services, Inc.*, 254 F.Supp.2d 1173, 1182 (D. Nev. 2003) (declining to limit

9    common law unfair competition to passing off).  "It would be impossible to draft in advance

10   detailed plans and speculations of all acts and conduct to be prohibited...since unfair and

11   fraudulent business practices may run the gamut of human ingenuity and chicanery." *People ex*

12   *rel. Mosk v. National Research Co. of Cal.*, 201 Cal. App. 2d 765, 772 (Dist. Ct. App. 1962);

13   *Barquis V. Merchants Collection Assn.*, 7 Cal. 3d 94, 112 (1972) (describing "unfair

14   competition" in a California statute as "establish[ing] only a wide standard to guide courts of

15   equity...given the creative nature of the scheming mind.").

16       Moreover, the law of unfair competition is responsive to changing conceptions of what

17   is wrong. *See Ely-Norris Safe Co. v. Mosler Safe Co.*, 7 F.2d 603, 604 (2d Cir. 1925) (L. Hand),

18   rev'd on other grounds, 273 U.S. 132 (1927) *("There is no part of the law which is more*

19   *plastic than unfair competition, and what was not recognized an actionable wrong twenty-*

20   *five years ago may have become one today."*).

21       The Restatement (Third) of Unfair Competition provides that: "[i]f conduct is likely to

22   interfere in a substantial manner with the ability of prospective purchasers to choose on the

23   merits of the competing products, it will ordinarily be considered unfair." *See* Restatement

24   (Third) of Unfair Competition §1*; see also Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,

25   905 F.Supp.2d 675, 691 (D. Md. 2012).  In analyzing unfair competition claims, courts have

26   repeatedly rejected the argument that common law unfair competition is coextensive with the

27   Lanham Act. *See, e.g.*, *Giordano v. Claudio*, 714 F.Supp.2d 508, 528 (E.D. Penn. 2010)

28   (applying the Restatement (Third) of Unfair Competition and recognizing a claim where the

15

defendant wrote a letter to a university denigrating the plaintiff researcher's reputation); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 691 (D. Md. 2012) (rejecting a narrow definition of unfair competition).  Moreover, the breadth of conduct illustrated in case law demonstrates unfair competition law's broad scope. *See* McCarthy citing *Gardiner v. Gendel*, 727 F. Supp. 799, 805 (E.D.N.Y. 1989) (sending meritless cease and desist letters alleging patent infringement); *Arthur D. Little, Inc. v. Dooyang Corp*., 147 F.3d 47, 55-56 (1st Cir. 1998) (ordering goods without intending to pay for them); *Hutcherson v. Alexander*, 264 Cal. App. 2d 126, 70 Cal. Rptr. 366 (5th Dist. 1968) (chasing plaintiff's employee who was passing out free refreshment tickets and constructing a high fence to block off customers' view of plaintiff's store and blocking traffic from coming into plaintiff's business).

Unfair competition under Macau law is similarly broad.  Macau Com. Code, Chap. II, Art. 162.  Article 162 provides that: "The making or broadcast of statements on the enterprise, products, services, or commercial relations of competitors, which are apt to diminish their credit in the market, is considered unfair except that they are exact, true and pertinent." *See id.*  Thus, Macau law covers a wide variety of statements made about different aspects of a business.

In this case, Defendant's widespread attempt to keep LT Game International from bringing the successful LTMG to the U.S. market constitutes unfair competition under Nevada common law and Macau law.  In addition to SHFL's false statements to Plaintiff's customers and prospective customers, SHFL caused the controversy and embarrassment to the LT Game Group at the 2012 G2E Asia.  *See* Isaacs Tr. at 74:11-24 (demanding Reeds give LT Game an ultimatum at the 2012 G2E), **Exhibit 4**; Chun Tr. at 51:2-52:17, 70:8-71:25; 62:20-63:5, **Exhibit 5**; Knowles Tr. at 169:24- 174:14, **Exhibit 3**. The controversy at the 2012 G2E Asia started on May 22, 2012 when SHFL took the law into its own hands, ignoring a court order and used undue influence to direct the organizers of the show to coerce Plaintiff into relinquishing its intellectual property rights. *See id.*  LT Game Group's booth was barricaded with a metal fence and trade show organizers threatened to shut down its vitally important power supply. *See* Chun Tr. at 57:7-8, **Exhibit 5**; Knowles Tr. at 169:24-174:14, **Exhibit 3**. Jay Chun was told to make an application to withdraw the court order and effectively relinquish

his intellectual property rights or LT Game would be evicted. *See id.* Plaintiff's important customers, including the Genting Group, witnessed LT Game Group's fenced off booth. *See* Chun Tr. at 57:7-8, **Exhibit 5**.

By Defendant's own admission, [redacted]

It is not surprising that based on these egregious acts and LT Game International's imminent deal with the Genting Group, SHFL's own expert, [redacted] Accordingly, SHFL's actions constitute unfair competition under Nevada common law and Macau law.

. . .

**D.    Defendant caused Plaintiff irreparable harm by intentionally interfering with prospective and current deals**

Defendant's contention that LT Game international lacks evidence to support this claim is unavailing. Under Nevada law, to succeed on a claim for interference with prospective economic advantage a plaintiff must prove: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *Wichinsky v. Mosa*, 847 P.2d 727, 729–30 (Nev. 1993).   Similarly, to establish intentional interference with contractual relations, the plaintiff must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *See Neumont University, LLC v. Little Bizzy, LLC*, No. 2:12-cv-1395-JAD-PAL, 2014 WL 2112938, *5 (D. Nev. May 20, 2014).  The knowledge element is satisfied if a plaintiff can demonstrate that the defendant knew of the existing contract or can establish "facts from which the existence of the contract can reasonably be inferred." *Nat. Right to Life P.A. Com. v. Friends of Bryan*, 741 F. Supp. 807, 813 (D. Nev. 1990).   Intent to harm can be established if a defendant knowingly directs false statements at a plaintiff's prospective customer. *Arsenal, Inc. v. Neal*, No. 2:11–cv–01628–KJD–CWH, 2013 WL 2405289, at *4 (D. Nev. May 31, 2013) (holding that false product reviews in YouTube videos directed at the plaintiff's prospective customers satisfied the knowledge and intent elements).

Here, there is no question SHFL has interfered and continues to interfere with LT Game International's prospective and current deals, often making repeated attempts at derailing LT Game International's entry into the U.S. market.  As a result of SHFL's actions, Plaintiff has suffered and continues to suffer actual harm including lost and compromised deals.  *See e.g.*, Feng Decl. at ¶¶ 12, 24-28; Meister Report at 6-7; Giuffre Report at 3-4; Harris Decl. at ¶¶ 3-4, **Exhibit 7**.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant's assertion that LT Game International lacks evidence to support this claim is baseless.  SHFL either knew or had reason to know about LT Game International's prospective contractual relationships

Further, given the small size of the gaming community, the prevalence of word of mouth communication, paired with Defendant's admission that LT Game is their biggest competition, it can reasonably be inferred that SHFL was aware of Plaintiff's prospective deals. *See id.*; Meister Report at 5-6.

LT Game International suffered actual harm as the result of SHFL's actions, as Plaintiff's prospective deals were either stalled or halted after customers expressed concern over Defendant's false representations and controversy at the 2012 G2E Asia. *See generally*, Giuffre Decl., attached expert report and supplemental reports; Meister Report; Feng Tr. Vol. II. at 86:20-25, **Exhibit 10**; Feng Decl. at ¶¶ 12-13, 24-29.

*See* Feng Tr. Vol. II. at 86:20-25, **Exhibit 10**.  As a result

of Defendant's actions, Plaintiff lost its deal with the Genting Group and its deal with Commerce Casino was and continues to be compromised. *See* Feng Decl., ¶¶ 12-13, 24-29;

██████████████████████. With respect to Commerce, Plaintiff had to share its profits on its contract with LT Game International U.S. *See* Feng Tr. Vol. I. at 90:18-21, **Exhibit 1**.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

   **E.     All evidence proffered by Plaintiff may be considered on summary judgment**

   Contrary to Defendant's contention, all of the evidence proffered by Plaintiff in this case is evidence that may be considered on summary judgment. ███████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████ Further, all evidence proffered by Plaintiff that is not currently in an admissible form can be presented through direct testimony at trial, and therefore may be considered on summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (***"[e]vidence is admissible for summary judgment purposes if it could be presented 'in an admissible form at trial.'"***) citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3rd. Cir. 1990) (emphasis added); *see ISG Insolvency Group, Inc. v. Meritage,* No. 2:11–CV–01364–PMP–CWH, 2013 WL 3043681, at *3-4 (D. Nev. June 17, 2013); *O'Connor v.*

*Starbucks Co.*, No. C 06-3706 VRW, 2008 WL 2761586, at *6 (N.D. Cal. July 14, 2008) *(". . . even if Plaintiff's testimony includes inadmissible hearsay, it may be reduced to an admissible form at trial by having the declarant present evidence through direct testimony.")*; *Cutrona v. Sun Health Corp.*, No. CV 06-2184-PHX-MHM, 2008 WL 4467101, at *7 (D. Ariz. Sept. 30 2008) (**"hearsay is admissible if there is any way to present it in an admissible form at trial"**) (emphasis added).[5]   Here, Plaintiff has demonstrated exactly how the hearsay statements at issue can be introduced at trial by identifying each declarant who made the statements.  Mr. Feng has testified at his deposition and in his sworn declaration ██████████████ ██████████████████████████████████████████████████████████████ *See* Feng Decl. at ¶¶ 10-11; Feng Tr. Vol. I. at 121:1-122:16, 125:18-126:18, **Exhibit 1**.  This matter was thoroughly briefed in Plaintiff's Response to Defendant's Objections to Evidence (Dkt. 110).

### F.   Even if Plaintiff's federal claims are dismissed, this Court may hear the other claims in this case

LT Game International has proffered more than ample evidence to sustain its federal claim under the Lanham Act, and this Court has subject matter jurisdiction over this case. Nevertheless, a district court has discretion to hear remaining claims even when federal claims are dismissed. *See Imagineering, Inc. v. Kiewiet Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992). In deciding whether to exercise supplemental jurisdiction when federal claims have been dismissed, a balance of factors is considered. *See id.*   These factors include economy, convenience, fairness, and comity. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Given how far the parties are in this case, that the case has been pending for almost two years, and that fact and expert discovery are closed, a dismissal or transfer of this case to state

---

[5]      Under the amended Rule 56(c)(2), hearsay evidence may be considered on a motion for summary judgment so long as the proponent can explain how it can be introduced in an admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2) advisory committee notes 2010 amendment ("[t]he burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated.*")(emphasis added). Accordingly, Defendant's reliance on *Lucey v. City of Reno* (2008 district court case) for the proposition that hearsay cannot be considered on a motion for summary judgment is no longer good law and is factually inapposite to the present case.

court would be inconvenient, unfair, and prejudicial to the Plaintiff.  All preparation for this case has been made in contemplation of the application and practice of the Federal Rules of Civil Procedure and Federal Rules of Evidence.  The federal District Court of Nevada is equally capable of addressing the state law claims in this case as a state court.  This case also involves a claim under a foreign law and this court is in just as good a position to apply the foreign law as a state court.  Finally, a dismissal or transfer to state court would only create an increase in legal fees, costs, and may require Plaintiff to hire additional counsel and/or replace lead litigation counsel.  Plaintiff's current lead counsel, who has represented the Plaintiff in this matter for over two years and has overseen and been responsible for all substantive matters in this action, has no experience in litigation or trial in Nevada state courts.

### G.   Defendant's argument that LT Game International lacks standing is untenable

LT Game International has standing under both Article III of the U.S. Constitution and the Lanham Act.

#### 1.   Plaintiff has standing under Article III of the U.S. Constitution

Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts. *See TrafficSchool.com, Inc. v. Edriver Inc*., 653 F.3d 820, 825 (9th Cir. 2011).  To establish Article III standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Henry v. Circus Casinos, Inc.*, 223 F.R.D. 541, 543 (D. Nev. 2004).

Article III's injury in fact element requires only an "identifiable trifle of harm," not an actual harm. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 (1973).  Thus, even a threat of injury can be sufficient to establish an injury in fact under Article III. *See Central Delta Water Agency v. U.S*., 306 F.3d 938, 947 (9th Cir. 2002).  Further, merely creating a chain of inferences showing how a defendant's false representations could harm the plaintiff's business can satisfy the injury in fact requirement. *See*

*TrafficSchool.com*, 653 F.3d at 825 (concluding that misrepresentations would tend to increase defendant's market share at plaintiff's expense because consumers tended to view the association created by defendant's misrepresentation favorably).

The factually inapposite Third Circuit case Defendant attempts to argue is misplaced. *See* Defendant's Motion to dismiss (Dkt. 119) at 12:2-13.  *Joint Stock Society* involves a foreign product with no presence in the defendant's U.S. market. *See Joint Stock Society v. UDV N. Amer.*, 266 F.3d 164, 177 (3rd. Cir. 2001).  Moreover, though the court characterized the injury as being "conjectural or hypothetical," it explained that had the plaintiff been poised to ship its vodka to the United States, it might have successfully showed it faced an "imminent" threat of injury sufficient to satisfy Article III's injury in fact requirement.  *Id.*

The injury in this case far exceeds what Article III requires.  Unlike *Joint Stock Society*, LT Game International is not some unknown entity that lacks intent to enter Defendant's market.  *See* Knowles Tr. at 43:9-12, **Exhibit 3**.  Plaintiff is actively marketing and selling LTMG in the U.S. *See* Feng Decl. at ¶¶ 20-22



Defendant's persistent argument that LT Game International needs a license to conduct business and therefore to suffer an injury is false and frivolous.  A license is not a prerequisite

to a prospective deal. *See* Rumbolz Tr. at 45:18-25, **Exhibit 8**; Feng Decl. at ¶ 30. Different jurisdictions have varying gaming product manufacturing and distribution licensing requirements. *See* Feng Decl. at ¶ 30.  In Australia and Malaysia, only a casino operator can apply for a license. ***See id.***

████████████████████████████████████████████████████████████████████████

Thus, an entity need not have a license to be injured.  In this case, LT Game International had prospective deals with casinos in the U.S. and abroad and has since closed numerous deals. Feng Tr. Vol. I. at 69:16-70:1; 131:20-132:16, **Exhibit 1**; Feng Decl. at ¶¶ 20-22. Indeed, gaming market participants often enter deals through agents and partners.  *See* Feng Decl. at ¶¶ 16-18, 30.

████████████████████████████████████████████████████████████████████████

### 2.      Plaintiff satisfies the Lanham Act's statutory standing requirements

In determining whether a plaintiff has statutory standing with respect to a Lanham Act false advertising claim, a court looks at two principles.  First, a court considers whether a plaintiff's interests "fall within the zone of interest protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1388 (2014).  This inquiry is not "especially demanding" and the benefit of the doubt goes to the plaintiff. *See id.* at 1389.  The test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that" Congress authorized the plaintiff to sue. *Id.*  Moreover, ***"lost sales and damage to its business reputation —are injuries to precisely the sorts of commercial interests the Act protects."***  *See id.* at 1393 (explaining that there is "no doubt" that lost sales and reputational damage are within the zone of interests protected by the Lanham Act.)(emphasis added).

Here, Plaintiff's injury is precisely the type the Lanham Act intends to protect against and thus satisfies the "zone of interest" statutory standing requirement.  Plaintiff has alleged and provided evidence of both injury to its reputation and sales as a result of SHFL's statements and actions. *See* Third Amended Complaint (Dkt. 115) at ¶¶ 21, 23, 27-28, 32-33, 37, 42, 47, 48, 52; Feng Decl. at ¶¶ 12, 24-28; Meister Report at 6-7; Giuffre Report at 3-4; Harris Decl. at ¶¶ 3-4, **Exhibit 7**.

Second, a statutory cause of action "is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1390.  The proximate cause inquiry looks to common-law principles, and recognizes that a plaintiff can be directly injured by a false or misleading statement even where "a third party, and not the plaintiff, ... relied on" it. *See id.* quoting *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 656 (2008). The Supreme Court expressly acknowledged that a consumer withholding trade from a plaintiff after being deceived by a defendant's advertising or promotion meets the proximate cause requirement. *See id.* at 1391.  Moreover, a competitor need not prove injury when suing to enjoin conduct that violates section 43(a) of the Lanham Act. *See Southland Sod*, 108 F.3d at 1145-46 ("even if Plaintiffs had failed to raise a triable issue as to causation and injury, their Lanham Act claim would still be viable to the extent it sought an injunction.").

Because of SHFL's statements, Plaintiff's deals with prospective customers were either lost or compromised. *See id.*; Feng Tr. Vol. I. at 62:20-63:5, **Exhibit 1**; Feng Decl. at ¶¶ 24-28; Rumbolz Tr. at 99:17-103:18, **Exhibit 8**; Meister Report at 5-6. Further, as Defendant has refused to comply with the law by continuing to make false statements to Plaintiff's customers, Plaintiff has standing to enjoin SHFL's conduct.  *See* Harris Decl. at ¶¶ 5-6, **Exhibit 7**.

**H.     Plaintiff's Third Amended Complaint satisfies the pleading requirements under the Federal Rules of Civil Procedure.**

Defendant's characterization of this Court's March 26, 2014 Order is incorrect. *See* Defendant's Motion to dismiss (Dkt. 119) at 6:3-9. Contrary to Defendant's assertion, unfair competition claims are not subject to heightened pleading. *See* Order (Dkt. 112) at 5:14-16 ("nothing in the elements of a Lanham Act false advertising claim themselves triggers Rule 9's heightened pleading standard."). The Court Order instead instructed "only the fraudulent-conduct allegations must satisfy Rule 9; the others 'need satisfy only the ordinary notice pleading standards of Rule 8(a).'" *See id.* at 6:9-12, *quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). As Plaintiff's Third Amended Complaint does not contain any "fraud-based" averments, Rule 8(a) is the applicable standard.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* FRCP 8(a)(2); *Sheppard v. Evans and Assoc.*, 694 F.3d 1045, 1049 (9th Cir. 2012). The touchstone of a court's inquiry is plausibility, not probability, and whether a defendant is on notice of a claim for relief, not whether that claim has been pled with specificity or particularity. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

As set forth above, Plaintiff's Third Amended Complaint more than pleads sufficient facts stating a plausible claim for relief under Rule 8(a).

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

26

## IV.    CONCLUSION

Based on the foregoing, Defendant's motion to dismiss Third Amended Complaint, or in the alternative, motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED this 5th day of June, 2014.

MEREDITH & KEYHANI, PLLC


By: */s/Dariush Keyhani*
    DARIUSH KEYHANI (DK9673) *(pro hac vice)*
    330 Madison Avenue, 6th Floor
    New York, New York 10017
    Email:    dkeyhani@meredithkeyhani.com

    JACQUELYN S. LELEU, ESQ. (#7675)
    AMANDA C. YEN, ESQ. (#9726)
    JOSEPH P. SCHRAGE, ESQ. (#11270)
    McDONALD CARANO WILSON LLP
    2300 W. Sahara Avenue, Ste. 1200
    Las Vegas, NV  89102
    Email:    jleleu@mcdonaldcarano.com
              ayen@mcdonaldcarano.com
              jschrage@mcdonaldcarano.com

    *Attorneys for Plaintiff LT Game International Ltd.*

LVDOCS-#307550

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of McDonald Carano Wilson LLP, and that on the 5th day of June, 2014, a true and correct copy of the foregoing **LT GAME INTERNATIONAL LTD.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification.

*/s/ Della Sampson*
An employee of McDonald Carano Wilson LLP